In the Matter of the ESTATE of Clara
O. HERM, Deceased.

Harry HELGESON, Temporary
Administrator of the Estate of
Clara O. Herm, Appellee;

v.

Arthur A. HENDERSON, Appellant.

Nos. 62092, 62093.

Supreme Court of Iowa.

Oct. 17, 1979.

Leo E. Fitzgibbons and Harold W. White of Fitzgibbons Brothers, Estherville, for appellant.

William Pappas, Mason City, and Eugene G. Sarno, Lake Mills, for appellee.

Considered by REYNOLDSON, C. J., and REES, McCORMICK, McGIVERIN and LARSON, JJ.

REYNOLDSON, Chief Justice.

This consolidated appeal arises from the combined trial of two actions in district court. In an equity action Harry Helgeson, as conservator of Clara O. Herm and later as temporary administrator of her estate, sought to set aside a deed and to nullify numerous inter vivos transfers of assets by Clara to Arthur A. Henderson, her nephew. The other action was brought by Elise C. Wood and Judith E. Bakke, Clara's nieces, raising objections to the probate of Clara's

purported will dated June 21, 1976. Following trial to the court, a decree was entered in the equity case which voided the deed and transfers. Judgment was entered in the second action declaring the will invalid. Arthur A. Henderson appeals and we affirm.

On April 16, 1977, Clara O. Herm, age 91, died at Lake Mills, Iowa. She survived her husband and left no children. Her next of kin were Arthur A. Henderson, Lowell A. Henderson, and Constance Hurd, children of her deceased brother Arthur; Elise C. Wood and Judith E. Bakke, children of a sister Ruth, who died in 1973 also survived by her husband Jacob Grimstead; and a sister Lilian Henderson Debban.

Plaintiff temporary administrator Helgeson alleged the deed and transfers of various accounts and certificates of deposit to Arthur A. Henderson were made when the latter stood in a confidential relationship with Clara and occurred when she was incompetent to transact such business. The objectors alleged the document Clara signed on June 21, 1976, purporting to be her last will, was made when she was incompetent. They claim the instrument was the result of fraud and undue influence practiced upon her by Arthur A. Henderson and Lowell A. Henderson.

Clara had a prior will executed in 1966. A first codicil was dated in 1969, the second in February, 1974. As finally amended this instrument bequeathed her home to Elise and Judith. The residuary was divided one-half to Elise and Judith and one-half to Constance, Arthur, and Lowell.

In May of 1975 Clara, accompanied by Arthur who had come from California, talked to her banker-lawyer Dean L. Brackey about deeding her home to Arthur, reserving a life estate. Brackey referred her to Richard Schwarm, an attorney in Lake Mills. Schwarm testified Clara called his secretary, informing the latter "she had to make a deed." He prepared and Clara executed the deed in controversy, dated May 19, 1975, conveying the home to Arthur subject to her life estate. Thereafter Schwarm conferred with Clara several times concerning her will. He prepared a will which Clara signed October 24, 1975. It left her household furnishings and related personal property to Elise and Judith. The document bequeathed the remainder equally among eleven persons: Clara's sister Lilian, Arthur and his wife, Lowell, Constance, Hazel Henderson (the wife of her brother Arthur), Judith and her husband, Elise and her husband, and Jacob Grimstead.

Attorney Schwarm testified Clara was concerned that farmland she sold in 1967 to the Grimsteads and to Elise and Judith for market price had subsequently increased in value and she felt the Hendersons (Arthur, Lowell, and Constance) had "not fared as well." He suggested she make an adjustment through "the use of her CD's and savings bonds." She made no such transfers at that time. Mr. Schwarm opined Clara was competent when these transactions occurred.

Dr. William B. Wood testified that five days after execution of the deed Clara stated to Elise and him, "I think I've done something bad. I think I've given my house away. What can I do? Help me." On June 24, 1976, Clara wrote Judith and her husband that, "I expect to see Arthur A. Henderson when he come [*sic*] and he may decide to live in the house he asked for . . . ."

In the summer of 1976 Arthur had moved from California into Clara's Lake Mills home. Apparently by May of 1976 Clara was staying with her sister Lilian in Albert Lea, Minnesota. The latter wrote the Wood family, "She [Clara] burns up lots of energy in her restless routine each day. I do think she is best off here but she needs watching. If I were more knowledgeable in the mental aspect of her condition, I could be more helpful in her daily routine. Maybe." There is no rebuttal to Dr. Wood's testimony that in October of 1976 he visited Clara in Lilian's apartment and at that time Clara was helpless, bedridden, incontinent with respect to her kidneys and bowels, unable to walk, falling asleep almost involuntarily, and "[h]er level of conscious awareness was almost zero."

Meanwhile, on June 21, 1976, Arthur and Lowell, an internal revenue agent, visited Clara in Lilian's apartment. Lowell typed the will in controversy in which Clara left all her property to Arthur and Lowell and named them co-executors. At the same time Lowell prepared a plenary power of attorney with the power vested exclusively in Arthur. Clara executed both instruments on the same day in Arthur's presence at the First Federal Savings and Loan Association in Albert Lea. The two witnesses were never called to testify in this litigation.

Commencing in June of 1976 through January 10, 1977, Arthur entered Clara's safety-deposit box in the Lake Mills bank eight times. By early October, 1976, using his power of attorney, Arthur had made himself a joint tenant with Clara on certificates of deposit totaling $29,500, issued by the Lake Mills bank. He obtained $13,000 of this by withdrawing it from Clara's checking account. Starting in August, 1976, Arthur withdrew large amounts of cash from Clara's account in the First Federal Savings and Loan in Albert Lea. A portion of these funds was transferred to his own account in Crocker National Bank in California and commingled with his own funds. Arthur cashed United States bonds, a number of them payable on death to Elise C. Wood, and purchased a $29,500 certificate of deposit with Arthur and Clara as joint tenants.

Arthur never used the power of attorney for any purpose other than to transfer assets into his own name. By the time Clara died in April, 1977, he had placed his name on almost all of her assets.

By November of 1976 Clara had been confined to an Albert Lea nursing home with complete nursing care. She had to be strapped in a chair, helped to the bathroom, and fed with a spoon. In January or February of 1977 she was transferred to a Lake Mills nursing home. Upon her death an autopsy disclosed death from bronchopneumonia. It also disclosed she had suffered from cerebral sclerosis with moderately severe cerebral atrophy—a degenerative process described as one which takes place over a long time period.

Dr. Edwin Bayrd, a Mayo Clinic physician who had treated Clara for many years, testified that by 1974 she could handle minor routine matters but not transactions so complex as making a will or investments. In his opinion by May of 1975 she would not have had the mental capacity to understand the implications of a property conveyance and would not have understood the nature and extent of her property.

Dr. Byron C. McGregor of Mankato testified he treated Clara commencing in January, 1976, through subsequent surgery and until May 3, 1976. In his opinion she was confused and would not have known the nature and extent of her property, nor would she have been able to handle business affairs. She would not have understood the nature of a conveyance. In his opinion this condition had existed for some time.

Dr. Wood, whom trial court found to be an interested but candid witness, also testified to Clara's incompetency in May of 1975 and at all subsequent times.

In a four-page rambling letter to district Judge Stone, Arthur stated, "Mrs. Herm deeded her home to me in June of 1975 by her own volition and desire and unknown to me." He also wrote, "During the spring, summer and fall of 1976 I and others of the Henderson family assisted Mrs. Herm in her business, and in everyway possible at her request." Arthur's testimony was vague concerning his knowledge of the deed and his whereabouts when it was executed. He first said he was in California, but finally conceded he was in Lake Mills on May 15, 1975, and "several days probably." While there is a question whether he realized the legal implications of his statements, he testified he occupied a position of mutual trust with Clara, that she was fond of him, and they enjoyed a confidential relationship.

Dr. Donald Bunce, an osteopathic physician-surgeon at Forest City, had never treated Clara but testified as a qualified expert witness that persons with arteriosclerosis have good days and bad days, and that he would place much credence in the

testimony of lay persons who had been in daily contact with Clara. Several lay persons testified that in their opinion Clara was not incompetent.

Trial court found that on and after May 19, 1975, Clara was incompetent and lacked mental capacity with respect to the conduct of her business affairs. The court further found that the relationship between Clara and Arthur was a confidential and fiduciary relationship and that Arthur was guilty of undue influence on Clara in all of the transactions occurring between them. The purported will and all the other transactions were declared void.

Appealing, Arthur claims these decisions should be reversed on the following grounds: (1) Trial court should have dismissed the equity case under the "clean hands" doctrine; (2) trial court erred in not permitting Arthur's counsel to cross-examine him after he testified for plaintiff and objectors as an adverse witness under section 624.1, The Code 1977; (3) trial court erred in admitting into evidence exhibit W, a letter from Arthur to Clara; (4) trial court erred in voiding the deed and other inter vivos transfers because Clara was competent, there was no confidential relationship, and she had independent and private legal advice in preparation of the deed; and (5) trial court erred in finding Clara was incompetent at the time she made her June 21, 1976, will and that the will was procured by undue influence.

I. *Availability of "clean hands" doctrine.*

Arthur claims in our de novo review in the equity action we should apply the "clean hands" doctrine and deny relief. He asserts plaintiff Helgeson is in privity with Elise and Judith who would directly benefit by voiding the transfers in controversy. He therefore argues any inequitable conduct by them should be imputed to Helgeson. The conduct he complains of is their removal of household furnishings from Clara's home while she was away in the summer of 1976. An elderly neighbor testified Clara said the items were stolen from her. Elise testified the furniture was given to these nieces by their aunt. There is evidence in the record

there was no subsequent estrangement between Clara and her nieces.

We are convinced the "clean hands" doctrine has no application in this situation. At the outset, we cannot find the privity between Helgeson and the nieces upon which Arthur posits his rationale.

Arthur has provided no decisions, nor have we found any, in which a personal representative of the deceased was held to be in privity with the heirs of the decedent so as to foreclose the fiduciary from pursuing estate assets. An executor or administrator is an officer of the court. *In re Ferris' Estate*, 234 Iowa 960, 973, 14 N.W.2d 889, 897 (1944); *see Suplee v. Stonebraker*, 195 N.W.2d 678, 682 (Iowa 1972). Such officer is not an agent of the heirs or beneficiaries: He or she does not derive his or her powers from them and is not subject to their control. *O'Connor v. Chiascione*, 130 Conn. 304, 307, 33 A.2d 336, 338 (1943); *see Rollins v. Shaner*, 316 Mo. 953, 958, 292 S.W. 419, 421 (1927); *In re Hughes' Will*, 241 Wis. 257, 263, 5 N.W.2d 791, 794 (1942); *In re Rigby's Estate*, 62 Wyo. 401, 415, 167 P.2d 964, 968 (1946). It follows that the relation of privity ordinarily does not exist between an administrator and the distributees from an estate; hence, there can be no estoppel of an administrator by any action or non-action of a distributee. *See Broom's Administrator v. National Auto Sales, Inc.*, 246 S.W.2d 1008, 1011 (Ky.1952).

Secondly, in our de novo review we find no convincing evidence Elise and Judith took the items of household furnishings without Clara's consent.

Finally, the "clean hands" doctrine ordinarily is invoked to protect the integrity of the court where granting affirmative equitable relief would run contrary to public policy or lend the court's aid to fraudulent, illegal or unconscionable conduct. *See Anita Valley, Inc. v. Bingley*, 279 N.W.2d 37 (Iowa 1979). It is separate from the equitable concept that "he who seeks equity must do equity," which requires a person seeking equitable relief to accord the other party all his equitable rights with

respect to the subject matter. *Myers v. Smith*, 208 N.W.2d 919, 921 (Iowa 1973), and citations.

Arthur's brief is obscure as to which doctrine he is advancing, although some of our earlier decisions are not helpful in clarifying the distinction. In any event, applying either doctrine, we fail to follow his reasoning. Arthur has made no claim for the household furnishings. Those items are not a subject matter of this litigation, nor is there any evidence Helgeson ever exercised any control of them. A finding for plaintiff in this equity proceeding would not endanger the integrity of the court, run contrary to public policy, nor lend the court's aid to fraudulent conduct.

We hold this ground urged for reversal has no merit.

II. *Failure to permit cross-examination in a section 624.1 situation.*

Plaintiff and objectors (hereinafter, plaintiffs) called Arthur as their first witness as permitted by section 624.1, The Code 1977, and questioned him over a period of approximately a day and a half. At the conclusion of this examination, Arthur's counsel[1] commenced a "cross-examination" but stopped when trial court suggested this questioning be deferred until the direct examination of the defendant witness. Arthur argues he was prejudicially deprived of his section 624.1 statutory right to be examined immediately by his own counsel. Plaintiffs urge the error, if any, was not preserved because Arthur made no offer of proof regarding the excluded testimony.

Section 624.1, The Code 1977, relevantly provides:

. . . . .

A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief.

The above language was added to section 624.1 by 1965 Session, 61st G.A., ch. 431, § 1; *see State v. Trost*, 244 N.W.2d 556, 559–60 (Iowa 1976). It was patterned after former Fed.R.Civ.P. 43(b).[2]

██ We agree with plaintiffs that the error, if any, was not preserved. The general rule is that failure to offer proof of excluded testimony leaves nothing for review. *Grosjean v. Spencer*, 258 Iowa 685, 695, 140 N.W.2d 139, 145 (1966). There is an exception when the whole record makes apparent what is sought to be proven. *Nizzi v. Laverty Sprayers, Inc.*, 259 Iowa 112, 119, 143 N.W.2d 312, 316 (1966). Arthur does not fall within this exception. *See Kramer v. F. W. Woolworth Co.*, 255 Iowa 633, 639, 123 N.W.2d 572, 575 (1963).

█ Nonetheless, we address this issue for the benefit of bench and bar. Section 624.1, The Code 1977, which was not cited to trial court, obviously permitted the "cross-examination" of Arthur. *See American Fidelity & Casualty Co. v. Drexler*, 220 F.2d 930, 934 (5th Cir. 1955). Trial court should have allowed the examination, subject of course to the statutory provision that it be confined to the subject matter of Arthur's examination by plaintiffs.

█ However, "cross-examination" as found in section 624.1 does not mean counsel has an unqualified right to ask leading questions of his or her own party client, its officers, directors, or managing agents. The majority rule is that generally where an "adverse" witness is shown to be friendly toward or biased in favor of the cross-examiner the reason for the rule, grounded on

---

1. Counsel for Arthur on this appeal did not serve as trial counsel.

2. Former Fed.R.Civ.P. 43(b) was abrogated by Supreme Court order in 1972, effective 1975. Act of January 2, 1975, Pub.L.No.93–595, § 3, 88 Stat. 1949. Provisions relating to examination of witnesses are now found in Fed.R.Evid. 611. Who may impeach is treated in Fed.R. Evid. 607.

the assumed hostility of such witness to the cross-examiner's cause, has ceased to exist and leading questions may not be used in examining such witness. Annot., 38 A.L. R.2d 952, 954 (1954).

One of the leading decisions on this issue, *J. & B. Motors, Inc. v. Margolis,* 75 Ariz. 392, 257 P.2d 588 (1953), points out that the fundamental reason for denying the cross-examiner the right to ask leading questions of a "friendly" witness is the lack of necessity of suggesting an answer and, in fact, the danger of eliciting an inaccurate response. Interpreting a statute similar to section 624.1, the court held no error was committed in denying counsel the right to ask leading questions of friendly witnesses on cross-examination. The *Margolis* court observed that if the witness had evidenced bias in favor of the party calling the witness, trial court, in its sound discretion, could have permitted leading questions on cross-examination. *Id.* at 396–97, 257 P.2d at 591–92.

*Margolis* followed Wigmore in this position. "[W]hen an opponent's witness proves to be in fact biased in favor of the cross-examiner, the danger of leading questions arises and they may be forbidden." 3 J. Wigmore, *Evidence in Trials at Common Law* § 773, at 166 (J. Chadbourn rev. 1970). Further support for the general rule is evident in *Mitchell v. United States,* 213 F.2d 951, 954–56 (9th Cir. 1954), *cert. denied,* 348 U.S. 912, 75 S.Ct. 290, 99 L.Ed. 715 (1955); *Nottingham Village, Inc. v. Baltimore County,* 266 Md. 339, 355–56, 292 A.2d 680, 688–89 (1972); *Neuhoff Brothers Packers v. Kansas City Dressed Beef Co.,* 340 S.W.2d 193, 196–97 (Mo.App.1960); *In re Rogan's Estate,* 404 Pa. 205, 214–15, 171 A.2d 177, 181 (1961); *State v. Hoffman,* 257 S.C. 461, 469–70, 186 S.E.2d 421, 425 (1972); *accord, McCormick's Handbook of the Law of Evidence* § 6, at 10 (2d ed. E. Cleary 1972); C. Mueller, *Adverse Party Examinations,* 6 Trial Lawyer's Guide 1, 20–23 (1962).

Although this court in *Sinift v. Sinift,* 229 Iowa 56, 75, 293 N.W. 841, 850 (1940), observed that "[l]eading questions are proper on cross examination," it also noted that "eliciting of testimony in this manner from a friendly witness on vital issues, as was done here, detracts greatly from the weight and value of such testimony." The opinion does not indicate an issue actually was raised, briefed, and argued on the issue of leading questions. The opinion antedates enactment of the relevant portions of section 624.1, quoted above. To the extent *Sinift* would imply trial court must permit leading questions in a section 624.1 "cross-examination" situation, the decision is overruled.

For the reason first stated, we find no reversible error in this contention.

III. *Admissibility of letter.*

■ Upon his cross-examination Arthur identified exhibit W as an April 26, 1975, letter he wrote to Clara and her sister. It stated his intention to be in the midwest until May 23, 1975. This was inconsistent with his testimony that he was in California on May 19, 1975, the date of the deed which conveyed the home to him. This portion of the exhibit was clearly admissible as it served to impeach the witness.

■ Plaintiffs' counsel then questioned Arthur concerning other statements in the letter. Defense counsel obtained no ruling on his objection during this interrogation and made no motion to strike. Under these circumstances, any error was not preserved. *Bahnsen v. Rabe,* 276 N.W.2d 413, 415–16 (Iowa 1979); *State v. Jones,* 271 N.W.2d 761, 767 (Iowa 1978); *Rasmussen v. Thilges,* 174 N.W.2d 384, 390 (Iowa 1970); Iowa R.Civ.P. 180. All of the letter was before the jury in this fashion when the exhibit was finally offered in evidence. Arthur's counsel objected to the offer "as irrelevant and immaterial to this cause of action. We're not trying Mr. Henderson's sanity here. We're trying the undue influence upon an elderly woman and her competency. It's not relevant at all to any issue in Division I." The objection was overruled and the exhibit was received.

Both parties argue extensively about the propriety of impeachment of a witness by evidence of mental disorder. Such evidence

may be admissible when it shows that the witness' "mental disorganization in some way impaired his capacity to observe the event at the time of its occurrence, to communicate his observations accurately and truthfully at trial, or to maintain a clear recollection in the meantime." *Commonwealth v. Butler,* 232 Pa.Super. 283, 287–88, 331 A.2d 678, 680 (1974), *quoted in State v. Harvey,* 242 N.W.2d 330, 337–38 (Iowa 1976). *See also State v. Miskell,* 161 N.W.2d 732, 735 (Iowa 1968).

We need not decide whether these statements were admissible on this ground. Arthur's general objections to the letter as a whole when a portion was clearly admissible were properly overruled. Ordinarily where evidence is offered and a part is admissible and a part inadmissible, a general objection to its reception is not sufficient to save the question of the inadmissibility of the objectionable part. To save the objector's rights he or she should indicate clearly that part of the offer to which he or she objects and move its exclusion. *Carson v. Metropolitan Life Insurance Co.,* 156 Ohio St. 104, 111, 100 N.E.2d 197, 202 (1951); *see also Yuin v. Hilton,* 165 Ohio St. 164, 172, 134 N.E.2d 719, 724–25 (1956); *accord,* 1 J. Wigmore, *Evidence in Trials at Common Law* § 13, at 300–01 (3d ed. 1940).

Here Arthur did not attempt to show trial court the severability of the admissible portion of the letter from any portions which might have been inadmissible; he merely objected to the entire letter as irrelevant and immaterial. This is not sufficient to preserve error in these circumstances.

Arthur vigorously contends that in these and other respects he was impeached by mere insinuations and slurs. However, "the conduct of the trial itself is largely left to the discretion of the trial court who is best able to determine whether or not counsel attempts to gain advantage by unfair tactics. We are slow to interfere with this discretion, and only in cases of clear abuse will we do so." *Smith v. Cedar Rapids Country Club,* 255 Iowa 1199, 1217, 124 N.W.2d 557, 568 (1963). We find no abuse of discretion in this instance.

IV. *Validity of conveyance of home and inter vivos transfers of assets.*

Trial court held Clara was incompetent when she conveyed her home to Arthur on May 19, 1975, and at all subsequent times when the latter was transferring her accounts and securities into his name. It also held there was a fiduciary and confidential relationship arising between them at all relevant times and that all transactions occurring between them on and following May 19, 1975, were fraudulent, invalid, and void.

These matters arise in the equity action. Our review is de novo. We give weight to the fact-findings of the trial court but are not bound by them. Iowa R.App.P. 14(f)(7). Of course this also applies to our review of trial court's finding of the existence of a confidential relationship. *Oehler v. Hoffman,* 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962); *Groves v. Groves,* 248 Iowa 682, 692, 82 N.W.2d 124, 130 (1957).

In *Dibel v. Meredith,* 233 Iowa 545, 549, 10 N.W.2d 28, 30 (1943), we referred to several legal principles involved in determining the existence of a confidential relationship:

Confidential relationship is a very broad term and is not at all confined to any specific association of the parties to it. In law it has been defined or described as any relation existing between parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party. In its broadest connotation the phrase embraces those multiform positions in life wherein one comes to rely on and trust another in his important affairs.

A confidential relationship arises whenever a continuous trust is reposed by one person in the skill and integrity of another, and so it has been said that all the variety of relations in which dominion may be exercised by one person fall within the general term "confidential relation."

Where such a confidential relationship exists, a transaction by which the one having the advantage profits at the expense of the other will be held presumptively fraudulent and voidable. *Marron v. Bowen,* 235 Iowa 108, 112, 16 N.W.2d 14, 16–17 (1944); *Curtis v. Armagast,* 158 Iowa 507, 520, 138 N.W. 873, 878 (1912). The burden of proceeding with the evidence then shifts to the claimant to establish by clear and convincing proof that the advantage was procured without undue influence. *Id.; see Jeager v. Elliott,* 257 Iowa 897, 910, 134 N.W.2d 560, 568 (1965). The rule is particularly applicable where one of the parties has a dominating influence over the other by reason of the affection, trust, and confidence of the latter in the former. *Curtis,* 158 Iowa at 521, 138 N.W. at 878; *see also Sinco v. Kirkwood,* 228 Iowa 1020, 291 N.W. 873 (1940). Mental strength of the person dominated has a direct bearing on the issue of undue influence. *Johnstone v. Johnstone,* 190 N.W.2d 421, 426 (Iowa 1971); *In re Estate of Telsrow,* 237 Iowa 672, 677–78, 22 N.W.2d 792, 796 (1946).

The evidence in this case convinces us that a confidential relationship existed between Clara and Arthur at least on and following the date of execution of the power of attorney. The subsequent transactions under which Arthur was favored were presumptively fraudulent and voidable. Arthur has not carried his burden to prove the contrary. *Marron,* 235 Iowa at 112–13, 16 N.W.2d at 16–17. Trial court was right in voiding these transfers of Clara's property.

Trial court found a confidential relationship existed on May 19, 1975, when Clara deeded Arthur her home, subject to her life estate. We need not address this issue because we find on the basis of clear, satisfactory, and convincing evidence, as did trial court, that Clara was not mentally competent at that time to make a valid conveyance. "The test here is not testamentary capacity. A higher degree of mental competence is required for the transaction of ordinary business and the making of contracts than is necessary for testamenta-

ry disposition of property." *Costello v. Costello,* 186 N.W.2d 651, 654–55 (Iowa 1971) (citing *In re Estate of Faris,* 159 N.W.2d 417, 420 (Iowa 1968)). Trial court rightfully voided the May 19, 1975, real estate conveyance.

Arthur vigorously argues that Clara's consultation with the attorney who drafted the deed constituted independent advice which negated any inference of undue influence. But Clara went to the attorney for the express purpose of having the deed prepared. There is no evidence she either sought or received independent advice concerning this conveyance. Although the attorney subsequently advised her that distributions could be made by transfers of bonds and certificates, we are convinced on this record, as was trial court, that those transfers resulted from Arthur's initiatives, not Clara's.

## V. *Validity of will.*

Trial court also voided the June 21, 1976, will in which Arthur and his brother Lowell were sole beneficiaries, on grounds both of Clara's mental incapacity and the undue influence exerted upon her by Arthur.

As beneficiaries under a prior will, Elise C. Wood and Judith E. Bakke had standing to contest this subsequent will. *Frazier v. State Central Savings Bank,* 217 N.W.2d 238, 239 (Iowa 1974). Their objections to the probate of the June 21, 1976, will were triable in probate as a law action. §§ 633.33, 633.311, The Code. Our review is for errors only and not de novo. *See In re Estate of Secrist,* 186 N.W.2d 665, 667 (Iowa 1971); *In re Estate of Handy,* 256 Iowa 61, 65, 126 N.W.2d 332, 334 (1964); *In re Estate of Hermence,* 235 Iowa 745, 748, 15 N.W.2d 905, 907 (1944); *cf. In re Estate of Kruse,* 250 N.W.2d 432, 433 (Iowa 1977) (review of decree interpreting will is de novo). Trial court's findings of fact are binding on this court if supported by substantial evidence. Iowa R.App.P. 14(f)(1).

The elements necessary to sustain a finding of undue influence in the execution

of a will were identified in *Frazier,* 217 N.W.2d at 244. They are: (1) The person must be susceptible to undue influence, (2) opportunity to exercise such influence and effect the wrongful purpose must exist, (3) a disposition to influence unduly for the purpose of procuring an improper favor must be present, and (4) the result must clearly appear to be the effect of undue influence.

The undue influence may be proven by circumstantial evidence, and unnatural, unjust, or unreasonable distributions are proper considerations. *In re Estate of Telsrow,* 237 Iowa at 677–78, 22 N.W.2d at 796. One who is infirm and mentally weak is more susceptible to influence than one who is not. *Id.; see also Olsen v. Corporation of New Melleray,* 245 Iowa 407, 416, 60 N.W.2d 832, 838 (1953).

A suspicion, but not a presumption, of undue influence arises where the dominant party in a confidential relationship participates in either the preparation or execution of the contested will. *Olsen,* 245 Iowa at 413–14, 60 N.W.2d at 836–37. While the burden of proof remains with the contestants, the law is well settled that, in considering the sufficiency of the evidence to support the findings of the court, properly introduced evidence must be viewed in the light most favorable to the contestants, giving them the benefit of all possible inferences. *Id.* at 413, 60 N.W.2d at 836.

We deem it unnecessary to detail further Arthur's participation in the preparation and execution of the controverted will, or the evidence disclosing Clara's incompetency. The record discloses substantial evidence to support trial court's findings. The court did not err in declaring the purported will void.

We affirm the decree and the judgment entered in the district court actions.

AFFIRMED.