wall in July 1988 and lifting a box in September 1988.

Hurley never told any of the doctors who were treating her in 1988 that her work at Sheller–Globe caused her to experience back pain. At the hearing, she indicated it was not the work she was performing at Sheller–Globe that caused her back pain, but standing.

The Deputy found there was no evidence in the record to corroborate Hurley's claim the alleged low back injury was work-related, and, in fact, the employer's records and the witnesses who testified at hearing showed Hurley did not complain of a work-related injury to any representative of Sheller–Globe; rather, she reported a low back injury which occurred at home. The Deputy noted Hurley "composed a less than credible version as to why her written claim forms were inconsistent with her testimony under oath." The Deputy ruled that in light of Hurley's history of back problems, her lack of credibility, and the lack of evidence of a work injury, she did not sustain an injury which arose out of or in the course of her employment.

The Deputy found no work-related injury occurred, therefore, there was no reason to consider the medical evidence on causation. Although both of the physicians whose opinions were reported in the record stated that Hurley's job could have contributed to her injury, the opinions are not controlling because the Deputy found her testimony did not support a finding a work-related injury occurred.

CITIZENS SAVINGS BANK, ANAMOSA, IOWA, Plaintiff–Appellee,

v.

James E. WILD and Lois E. Wild, Defendants–Appellants,

and

Jones County, Iowa, Defendant–Appellee,

and

Farmer's Cooperative Elevator, State of Iowa, Continental Grain Company, Wayne Feed Company, Commodity Credit Corporation, George H. Caspers, Ford Motor Credit Company, and Deutz–Allis Credit Corporation, Defendants.

CITIZENS SAVINGS BANK, ANAMOSA, IOWA, Plaintiff–Appellee,

v.

James E. WILD and Lois E. Wild, Defendants–Appellants.

No. 92–949.

Court of Appeals of Iowa.

Dec. 29, 1993.

Richard D. Raymon, Cedar Rapids, for appellants.

David M. Remley and Mathew G. McQuillen of Remley, Willems & McQuillen, Anamosa, for appellee Citizen's Sav. Bank.

Considered by DONIELSON, P.J., and SCHLEGEL and HABHAB, JJ.

SCHLEGEL, Judge.

Defendants argue the district court erred in: (1) granting a decree of foreclosure; (2) finding no fraud or misrepresentation occurred; (3) denying their motion for a new trial; (4) denying their request to present additional evidence; and (5) denying their motion for continuance.

This foreclosure action was brought by the plaintiff, Citizen's Savings Bank (CSB) against the defendants, James and Lois Wild, as owners of real estate and personal property, based on an indebtedness in the amount of $937,000 secured by two deeds of trust and a blanket agricultural security agreement. Wilds had been doing business with CSB since 1962. Throughout the following thirty years, Wilds acquired a significant amount of farmland. At the time of trial, Wilds owned 1100 acres and rented another 900 acres. Throughout this period, Wilds obtained financing for their farming operations from CSB. Wilds developed a business relationship with the president of the bank, Ernie Buresh.

Beginning in the 1980s, Wilds' loan balance with CSB increased dramatically, from $112,700 in the 1970s to $608,416 by 1986. Due to the farm economy, Wilds began to lose money, losing approximately $192,414 between 1980 and 1986. CSB's loans to Wilds were virtually unsecured until 1983, when CSB and Wilds entered into a blanket agricultural security agreement covering all of the farm property, including the crops. In March 1984 James conferred with James Krumm, executive vice-president of CSB, to discuss Wilds' continuing loss of net worth. Throughout 1984 and 1985, Wilds and CSB discussed the deteriorating financial situation of the farming operation. In June 1985 Krumm noted that it might be advisable for the bank to ask for a mortgage and a contract assignment.

On January 1, 1986, Wilds owed CSB $608,416, considerably more than the value of the property covered by the security agreement signed earlier. On March 6, 1986, James visited with Krumm, who stated that he could not loan Wilds more money. James demanded a meeting with Buresh. At the meeting with Buresh, Buresh told Wilds that CSB could not extend Wilds any more credit without mortgages and an assignment of contract. Wilds needed $25,000 to make farm payments and $44,000 for the 1986 operation expenses.

At this time, the parties began discussion of consolidating some of the notes into a larger note at an eleven percent interest rate. Wilds agreed to bring all of their abstracts and to give CSB a deed of trust on all of the property they owned as well as an assignment of their equity in the lands not yet paid for. The parties agreed that the 115–acre homestead would be excluded from the deed of trust.

On April 30, 1986, Wilds met with Marguerite Stoll of CSB and signed a number of documents, including a demand note for $579,397.34, deeds of trust for their lands in Jones and Linn Counties, an assignment of contract, and a $25,000 note due February 1, 1987, at eleven percent interest. Wilds read the documents before they signed them.

Throughout 1987, CSB loaned Wilds additional funds for various farming operation expenses and for Wilds' participation in the federal pik and roll program. In 1987 Wilds also expressed a desire to secure financing from a different financial institution. A representative of CSB contacted Farm Credit Services to obtain suggestions about helping with Wilds' cash-flow problems. In March 1988 Wilds met with Dave Strautz of CSB, who informed Wilds that CSB was no longer in a position to lend them more money. On March 29, 1988, Wilds went to CSB with their attorney to discuss the possibility of obtaining long-term financing of their notes totaling $650,000. About this time, the Farm Credit Services rejected Wilds' application for a loan due to capacity to service debt and capital position.

In July 1988 Buresh met with Wilds' attorney and expressed his concern about Wilds' financial position. Buresh stated it might be advisable to seek the involvement of the Farmer's Home Administration (FHA). On November 29, 1988, Wilds, along with their attorney, went to CSB and requested CSB to write down the amount owing the bank. Wilds threatened to sue CSB on the grounds that CSB cut off their financing if CSB did not agree to a write-down. Shortly thereafter, CSB requested mediation. An agreement was reached on March 6, 1989, at which time Wilds agreed to update CSB on their progress towards refinancing. However, on April 24, 1989, Wilds filed a damages action against CSB. That action was subsequently dismissed.

CSB filed two petitions for foreclosure on June 7, 1989, one in Jones County and one in Linn County. The cases were eventually consolidated. Wilds filed a counterclaim, alleging breach of contract, breach of fiduciary duty, fraud, misrepresentation, failure of consideration, and punitive damages. A receiver was appointed by the district court. On January 15, 1992, Wilds filed a motion for a continuance which was denied by the district court. On January 20, 1992, one of Wilds' attorneys filed a motion to withdraw for personal reasons, and on that same date, Wilds' co-counsel also filed a motion to withdraw. Wilds filed a motion for continuance which was resisted by CSB. At a hearing on the motions, the district court ruled that co-counsel could withdraw but denied the other counsel's motion to withdraw.

On January 27, 1992, Wilds filed a chapter 11 bankruptcy petition. As a result, trial was rescheduled for February 17, 1992. The district court ruled in favor of CSB and ordered the foreclosure of Wilds' property. Wilds subsequently filed a written request to present additional evidence which was overruled. A supplemental decree was filed, entering judgment against Wilds. The judgment was declared a superior lien on the personalty and real estate, and the deeds of trust, assignments of contract, and agricultural security agreements were foreclosed. Wilds' counterclaim was denied. Wilds' subsequent motion for a bill of exceptions and rule 179(b) motion were denied. Wilds appeal. We affirm.

This foreclosure action was tried in equity pursuant to Iowa Code section 654.1 (1991). In this equity action, our review is de novo. Iowa R.App.P. 4. We have a duty to examine the entire record and adjudicate anew rights on the issues properly presented. *In re Marriage of Steenhoek*, 305 N.W.2d 448, 452 (Iowa 1981). We give weight to the fact findings of the trial court, especially when considering the credibility of witnesses, but are not bound by them. Iowa R.App.P. 14(f)(7).

Wilds' first contention on appeal is that the district court erred in granting a judgment and decree foreclosing plaintiffs' deeds of trust and assignments of contract and agricultural security interests. Closely associated with this contention is Wilds' claim that the district court incorrectly dismissed their counterclaim after incorrectly concluding Wilds had failed to carry their burden of proving fraudulent misrepresentation. We consider these issues together on appeal.

Wilds have the burden of proof to establish their claim of fraudulent misrepresentation by clear, satisfactory, and convincing evidence. The elements of fraudulent misrepresentation include: (1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damages. *Irons v. Community State Bank*, 461 N.W.2d 849, 853–54 (Iowa App.1990). If Wilds successfully establish the existence of a fiduciary or confidential relationship between them and CSB, the burden of proof shifts to CSB to establish by clear and convincing evidence that the transaction was entered into voluntarily. *Peoples Bank & Trust Co. v. Lala*, 392 N.W.2d 179, 185 (Iowa App.1986).

Having thoroughly studied the record in this case, we conclude Wilds have failed to establish the existence of a fiduciary or confidential relationship. "A confidential relationship arises whenever a continuous trust is reposed by one person in the skill and integrity of another...." *In re Estate of Herm*, 284 N.W.2d 191, 199 (Iowa 1979).

In law [a confidential relationship] has been defined or described as any relation existing between parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party. In its broadest connotation the phrase embraces those multiform positions in life wherein one comes to rely on and trust another in his important affairs.

*Id.*

The evidence contained in the record does not support Wilds' contention that a special trust and confidence existed between them and Ernie Buresh. The evidence does not indicate that Buresh and Wilds were close personal friends or that they socialized together on any regular basis. Furthermore, the record indicates that Buresh did not personally handle Wilds' loans until March 1986.

Buresh had little contact with Wilds. Buresh met briefly with James Wild on or about March 1, 1986, and met with Wilds on March 10, 1986. At that time the arrangements for the promissory note, deeds of trust, assignments of contract, and large note were made. However, Buresh was not even present at the time these documents were signed on April 30, 1986. Since Wilds have failed to show they maintained a continuous trust in Buresh or CSB to the extent of establishing a confidential relationship, the burden remains on Wilds to prove their fraudulent misrepresentation claim by clear, satisfactory, and convincing evidence.

The basis for Wilds' fraudulent misrepresentation claim is explained in their brief as follows:

Ernie Buresh represented that in order to continue financing the Wild farming operation, they would need to secure the present outstanding debt. This was not the true intention of the plaintiffs at the time the Deeds of Trust were signed. The Bank failed to disclose material facts to Defendants that led to the Deeds of Trust being signed. Those material facts were that the Bank had no intention of financing the Wild's [sic] farming operation in the long term; that the interest rate on the Deeds of Trust would be 12 percent, not 11 percent as represented in the March 1986 meeting; that the Deeds of Trust were of a much more serious nature than a mort-

gage; that the Bank's true intention was to obtain title to the real estate; that the Bank's intention was to declare all debt accelerated and due for full payment; that the Wild's [sic] would not be able to obtain financing from another Lender due to the Deeds of Trust which covered all of Defendants assets, and further that in the event of default, the entire matter would go automatically into receivership.

The evidence contained in the record does not support Wilds' claim by clear, satisfactory, and convincing evidence.

The record reveals CSB continued to finance Wilds' farming operation by loaning them an additional $150,000 in new money between March 10, 1986, and February 24, 1987. This fact negates Wilds' contention that the bank had no intention of financing Wilds' farming operation. In addition, the interest rate on the large promissory note signed April 30, 1986, was eleven percent. The only mention of any twelve-percent interest rate is on page two of the deeds of trust. That twelve-percent interest rate is a default interest rate and was never charged by CSB notwithstanding the fact that Wilds were in default.

Similarly, Wilds' claim that CSB's true intention was to obtain title to the real estate or to declare all debt accelerated and due for full payment is unsupported. If the bank had such intentions, it could have refused to rewrite the old notes which were at higher interest rates than the new note. Even though this was a demand note, no demand for payment was made until January 10, 1989, notwithstanding the fact that Wilds had paid no interest since February 1, 1988. The note called for interest to be paid quarterly. Nonetheless, CSB kept the demand loan in place for over two and one-half years from the date of the April 30, 1986, promissory note. During that time, Wilds sold collateral for the loan and did not apply it to the Citizen's Savings Bank loan; Wilds made large loans to family members instead.

Wilds further allege that CSB failed to disclose that in the event of default, the entire matter would automatically go into receivership. The terms of the deeds of trust do not provide for automatic appoint-

ment of a receiver. A receiver was appointed only after a full court hearing upon notice to Wilds.

James Wild knew when he went to CSB on March 10, 1986, that his loan with the bank was undersecured; that he had not repaid his crop loans for the years 1981 through 1985; that his loan balance at the bank had gone up to in excess of $600,000 by March 10, 1986; and that the bank was not going to loan Wilds any additional money without deeds of trust and assignments of contract. Wilds' fraudulent misrepresentation claim is not supported by the evidence.

We have considered Wilds' remaining contentions on appeal, including their claims that the district court erred in: (1) denying their motion for a new trial; (2) denying their written request to present additional evidence; and (3) denying their motion for a continuance. We review these issues for an abuse of discretion. In order to show an abuse of discretion, one generally must show that the court exercised its discretion " 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.' " *State v. Blackwell,* 238 N.W.2d 131, 138 (Iowa 1976) (quoting *Weeks v. Burnor,* 132 Vt. 603, 326 A.2d 138, 140 (1974)). We find these contentions to be without merit.

In accordance with the above discussion, we affirm the district court's judgment.

**AFFIRMED.**