**IN THE COURT OF APPEALS OF IOWA**

No. 24-0954
Filed April 9, 2025

**IN THE MATTER OF THE ESTATE OF DELORES I. TODD, Deceased.**

**LISA WITTEN and DEBRA TEMPLEMAN,**
        Plaintiffs-Appellees,

**vs.**

**BARBARA RADKE, Individually and as Executor,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Ida County, Steven J. Andreasen,

Judge.

        An executor appeals a jury verdict invalidating a will.  **AFFIRMED.**

        Alexandra M. Cutler (argued) and David L. Charles of Belin McCormick,

P.C., Des Moines, for appellant.

        Maura Sailer (argued) of Sailer Legal, PLLC, Denison, for appellees.

        Heard at oral argument by Ahlers, P.J., and Badding and Buller, JJ.

**BULLER, Judge.**

Barbara Radke, the executor for the estate of Delores I. Todd, appeals a jury verdict finding Delores lacked testamentary capacity when she executed her 2010 will and that the will was the result of undue influence. Finding sufficient evidence was presented to submit the question of undue influence to the jury, and concluding the court did not err or abuse its discretion on the other preserved legal challenges, we affirm.

## I.      Background Facts and Proceedings

Delores, born 1931, was married to Ralph Todd. They lived and farmed in Ida County, and raised seven children: John, Debra, Barbara, Charles, Michael, Lisa, and Mark.[1] In early 1995, Ralph died from a heart attack; he did not have a will. Following advice from Delores's attorney, the children signed over to Delores any claim they arguably had to Ralph's estate. Delores then executed a last will and testament generally devising all her property to her "beloved children," "share and share alike." Some years later, Delores inherited another farm from her mother in addition to the land she had owned with Ralph.

At the time of Ralph's death, the farms were in significant debt and close to foreclosure—both from normal farm debt and debt assumed on John's behalf. Delores was "lost" after Ralph passed away, so John, Charles, and Mark banded together and committed to working the farms and paying off the debt. None of them were paid for their work beyond room and board, farm goods, and use of Delores's farm equipment. John did most of the combining and planting. Charles

---

[1] We will refer to the entire Todd family by their first names, though we note the three daughters (the named parties in this appeal) have different surnames.

did the hauling, discing, and chores. Mark took care of cows and helped lead business and financial matters for the farm operation. While Delores was nominally "in charge," her role was more one of advice and approval of suggestions from her sons.

Delores's other four children were less involved in the farming operation, but all frequently visited her and talked with her on the phone. Lisa would help Delores with cleaning her home, laundry, and grocery runs. Barbara also helped with the household chores and took Delores to appointments.

When Delores sold an acreage to Charles in 2002 at far below market value, the other children disapproved—in part because the farms were not yet solvent. After that sale, Mark and Delores signed a note that Mark called "a joke," which read: "I will talk to Mark before I do anything stupid again."

Starting in 2005, Delores visited a local attorney several times about updating her will. Generally, she came to the appointments alone. Delores brought notes and a handwritten will to some of their meetings, listing which child would inherit each section of land and making cash-value calculations—"her attempt" to treat her seven children equally—and she asked the attorney if "that was sufficient to handle things in her estate." Delores's calculations were based on the land's 1995 value, and the attorney suggested other ways to value the land or determine equalizations, but did not think to warn her in writing that her valuation could lead to inequity based on fluctuations in the land's value by the time of her death.

Between 2000 and 2010, Delores had ongoing conversations with her brother, at times mentioning she was upset her children were already fighting over

her belongings, who she wanted to have different properties, and expressing concern "how to keep it even, . . . fair with [her] children." Around 2008, they talked about property values and that those inheriting land "could probably borrow money against their dirt so that they would all share and share alike." She then spoke with Mark, asking for a value for the land for her will. They discussed the price her brother had recently gotten for his land (nearly $8000 an acre), and Mark told her "you don't know what it's going to be worth the day you die, so it's kind of hard to put a number on it." Mark told her if she used a low number, "if it's not right, I'm sure we will have to make it right."

In June 2010, at the age of seventy-nine, Delores executed a new will. The new will bequeathed specific parcels of farmland she owned to five of the children (John, Barbara, Charles, Michael, and Mark) and set equalization payments based on the land's 1995 value to the other two (Lisa and Debra). The attorney who drafted the will had no concern and saw no indication Delores was being influenced or did not know what she was doing.

Following Delores's death in early 2020,[2] Barbara petitioned in probate and submitted Delores's 2010 will. The appraised value of the farmland left to John, Barbara, Charles, Michael, and Mark totaled $2.9 million dollars, with the individual properties ranging in value from $484,000 to over $764,000. The cash equalization payments to Lisa and Debra were $55,434 each.

Lisa and Debra petitioned to have the will set aside, alleging Delores "was of unsound mind and incapable of making a will" and that she "was unduly

---

[2] John predeceased Delores, dying in 2019. John's children inherited his share of their grandmother's estate.

influenced to such an extent that her mind was overcome and the will was not her will"—all claims Barbara (as executor) denied on behalf of the estate. Several months later, Lisa and Debra requested declaratory relief, noting approximately thirty acres of land had not been specifically devised in the 2010 will and asking the court to construe the will for equal treatment "consistent with [Delores's] intended goal."

The declaratory-relief action was tried to the bench in early 2022. The district court noted that, for purposes of construing the will, Delores's competency and the 2010 will's validity "are essentially assumed" and the questions of undue influence and testamentary capacity would be tried to a jury at a later date. The court enforced the unambiguous terms of the will, including the twenty-five-year-old land values used to calculate the equalization payments. The court also found the acres not specifically devised were devised "by implication" and were intended to go to the sons inheriting the adjacent parcels of land based on Delores's notes. Lisa and Debra appealed, and we affirmed the court's construction of the 2010 will. *In re Est. of Todd*, No. 22-1211, 2023 WL 3860112, at *5 (Iowa Ct. App. June 7, 2023).

In December 2023, a jury heard the will challenge. Unsurprisingly, the two sides painted very different pictures of Delores and her abilities as she aged.

Several acquaintances and family members testified Delores was always trying to be fair among the children. Thaddeus Cosgrove, an attorney who represented Delores starting around 1995, did her tax returns every year, and was her estate's attorney, testified he believed Delores "would want the outcome of her estate to be that her beneficiaries, her children, would be treated equally." Lisa

explained Delores gave gifts that were "always the same" and that "every single person" was given the same or equivalent gifts for specific events. After the farms were solvent and making a profit, Delores would give the seven children equal checks at Christmas. Debra described her mother's determination to treat all her children equally, included setting a timer for how long each got to play with a toy and counting out equal numbers of candies at snack time. Delores even kept a notebook keeping track of who got hay bales or farm debt.

A cousin testified that Delores consulted with her brother and asked for advice about how to be fair in her will distribution. Delores talked about which child would get each parcel of land and that those inheriting land could borrow against it to equalize the distribution. The cousin testified categorically that Delores "never wanted" to reduce Lisa and Debra's share compared to the others; she wanted them to share and share alike. To support his view of Delores, the cousin recounted a story of Delores and her brother convincing their mother to not disinherit their sister, who had taken significant amounts of money from their parents, because "she was a sibling, and she should inherit just like the rest."

Several family members testified regarding Delores's mental health as she aged. Lisa first noticed a problem in 2007, when Delores fell for a phone scam seeking bail money for a grandchild (who had not actually been arrested). Lisa told the jury her mother had been diagnosed with dementia in 2014—the first time she was tested for it—but "it started way before we would admit something was wrong."

Mark said he noticed a decline in Delores's cognition before she moved to the nursing home, that she would be "confused, jittery, nervous," and that the

children would hide the signs of decline from their mother, keeping watch and having one or more children at her house every day. He recalled a time around 2009 when his mother watched what she called a "new" episode of Gunsmoke or Bonanza, despite the shows only airing reruns for more than thirty years. Mark's wife Becky testified about traveling with Delores in summer 2010. Becky described Delores as "nervous," "confused," and "out of sorts," and Mark agreed with her description. A sandwich shop with a different layout than the one near their home "really confused" her and she needed to be coached through the ordering process.

Debra described taking Delores on a vacation in 2009, recounting how her mother was nervous, and she "would continually ask the same questions and tell the same stories" within a single meal time. Debra recalled Delores had been asking the same questions and repeating the same stories at home before this, but Debra but couldn't pinpoint a specific date before the 2009 vacation. On that trip, Delores was nervous and would get confused about things like how to make a cup of coffee or where she left her purse. And on another trip in summer 2010, Delores struggled with menus in restaurants, simply copying what Debra would order. After venturing outside alone—which was not common for Delores—she could not figure out how to go back into the rented townhouse. Debra explained the children took Delores in for mental-status testing in 2014 "[a]fter she had fallen several times" and that they had been trying to protect their mom and keep her in her home.

In contrast, Michael described Delores as "in pretty good health" in 2010. Barbara denied Delores had any decline in mental capacity between 1995 and 2010, describing her as having "a mind of her own" and that "[s]he knew what she

wanted to do." She observed Delores's mental decline occurred in the couple years before entering the nursing home, starting around 2013. Although she described her mom as running the farm as she wanted, the only instance Barbara could remember of her mom not doing what all the sons wanted was selling the property to Charles in 2002.

Lisa and Debra were asked at trial about how their siblings influenced their mother. Lisa suspected Barbara of influencing Delores because Barbara was the one driving Delores to her appointments and spending a lot of time with her. And Lisa opined that, if Delores was going to split things unevenly, she expected most would go to John, Charles, and Mark—who had been farming for their mother for many years—not to Michael and Barbara. Barbara, who knew the contents of the will before everyone else, told Lisa: "It's bad. It's really bad." When Lisa voiced that their mother was "a fair woman," Barbara said she had told Delores she "had interest in that Holstein farm"—a farm all the children wanted and was the most valuable land. Lisa argued Charles was able to exercise undue influence because Delores "took care of him his whole entire life," including providing him housing, gas for his vehicles, and babysitting his children every day—benefits not afforded to the other children. Charles also purchased twenty acres from Delores in 2002 at $750 an acre (far below market rate)—another benefit no other child received.

The cousin testified that, in 2009, Michael mentioned seeing Delores's will,[3] and he didn't think it was fair his brothers were getting land and he wasn't. The cousin said he would not be surprised if Michael had coerced Delores into giving

---

[3] Among the notes Delores provided to the attorney drafting her will was a version of the distribution showing Michael as a cash recipient instead of inheriting land.

him some land. Michael contested his cousin's testimony about discussing having seen Delores's estate plans in 2009 and wanting some land, saying he did not recall any estate-plan conversation with him and protesting he never made any suggestions about how Delores should dispose of her property.

When questioned about how Delores had assigned the farms, Mark agreed each made sense. But he also testified "yes" when asked if he thought "the reason why for the low value is based on what you told your mother." He was adamant: "[s]he would have wanted everything equal." He admitted not talking to any of his siblings about Delores using low values in her will, and he didn't know if the siblings would agree to "make it right," but he assumed they would be on board.

The jury determined Delores lacked testamentary capacity when executing the 2010 will and that the will was the result of undue influence. The jury unanimously found Barbara, Michael, and Mark had each unduly influenced Delores. And the court denied posttrial motions for judgment notwithstanding the verdict and for new trial. Barbara appeals.[4]

## II.    Standard of Review

"An action to set aside a will is tried as a law action[,] and our review on appeal is for correction of error of law." *In re Est. of Bayer*, 574 N.W.2d 667, 670 (Iowa 1998).

We review the denial of a motion for directed verdict for correction of errors at law. *Pavone v. Kirke*, 801 N.W.2d 477, 486 (Iowa 2011). Similarly, "[w]e review

---

[4] Charles filed a joinder to Barbara's brief, but Barbara was the only defendant who filed a notice of appeal. While Charles joined Barbara's posttrial motions, he did not timely file a notice of appeal, and he cannot challenge the district court ruling.

the denial of a motion for judgment notwithstanding the verdict for correction of errors at law." *Van Sickle Constr. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010). We determine if, "viewing the evidence in the light most favorable to the nonmoving party," each element of the claim was "supported by substantial evidence to warrant submission to the jury." *Id.* "Where reasonable minds could differ on an issue, directed verdict is improper and the case must go to the jury." *Pavone*, 801 N.W.2d at 487 (citation omitted).

"The scope of our review of a district court's ruling on a motion for new trial depends on the grounds raised in the motion." *Id.* at 496 (citation omitted). "To the extent the motion is based on a discretionary ground, we review it for an abuse of discretion. But if the motion is based on a legal question, our review is on error." *Id.* (citation omitted).

### III.    Discussion

Barbara first argues the court should have granted her directed-verdict, judgment-notwithstanding-the-verdict, and new-trial motions on the questions of testamentary capacity and undue influence. She also urges us to order a new trial based on an evidentiary question and a jury-instruction challenge. Finally, she raises questions regarding the instructions and verdicts form addressing which children may have exerted undue influence.

### A.    Undue Influence

Barbara claims the court erred in denying her motions for directed verdict and judgment notwithstanding the verdict because substantial evidence does not support the jury's finding of lack of testamentary capacity and undue influence. She urges the jury relied on suspicion, speculation, or conjecture in making its

decision, not actual evidence. Because the undue influence claim is dispositive, we need not address Barbara's challenge to the testamentary capacity verdict.

Undue influence was explained to the jury as follows:

Undue influence means a person substitutes his or her intentions for those of the person making the Will. The Will then expresses the purpose and intent of the person exercising the influence, not those of the maker of the Will. Undue influence must be present at the very time the Will is signed and must be the controlling factor. The person charged with exercising undue influence need not be personally present when the Will was being made or signed, but the person's influence must have been actively working at the time the Will was being made and signed.

In order to set aside a will based on undue influence, contestants must prove by a preponderance of evidence that:

(1) the testator was susceptible to undue influence; (2) defendants had an opportunity to exercise undue influence and effect the wrongful purpose; (3) defendants had a disposition to influence unduly to procure an improper favor; and (4) the result, reflected in the will, was clearly the effect of undue influence.

*Bayer*, 574 N.W.2d at 671 (citations omitted); *see Burkhalter v. Burkhalter*, 841 N.W.2d 93, 99–101, 105–06 (Iowa 2013) (examining the burden of proof in undue influence claims). Undue influence is the "equivalent to moral coercion" and must rest on "a solid foundation of established facts." *Bayer*, 574 N.W.2d at 671 (citation omitted). "The undue influence may be proven by circumstantial evidence, and unnatural, unjust, or unreasonable distributions are proper considerations." *In re Est. of Herm*, 284 N.W.2d 191, 201 (Iowa 1979). "One who is infirm and mentally weak is more susceptible to influence than one who is not." *Id.*

The jury was further instructed it could consider the following in determining if the will was the result of undue influence:

1. Dominance over Delores Todd as the maker of the Will.

2. Whether the condition of Delores Todd was subject to such dominance.

3. Whether the distribution of Delores Todd's property is unnatural, unjust, or unreasonable.

4. The activity of the person charged with exercising the undue influence and whether the person had the opportunity and frame of mind to exercise undue influence. Activities may include suggestion, request, and persuasion short of controlling the Will of Delores Todd, but they do not alone constitute undue influence. Consider such activities along with any other evidence of undue influence.

5. The intelligence or lack of intelligence of Delores Todd.

6. Whether Delores Todd was physically or mentally weak.

7. Whether the person charged with exercising undue influence was the controlling party in a confidential relationship with Delores Todd. A confidential relationship is present when one person has gained the complete confidence of another and purports to act or advise with only the interest of the other party in mind.[5]

8. Any other facts or circumstances shown by the evidence which may have any bearing on the question.

No one of the above circumstances is more important than any other.

Substantial evidence was presented on several of these factors, particularly when viewed in the contestants' favor. *See Van Sickle Constr.*, 783 N.W.2d at 687. First, no one really argued the distribution in the will was fair considering Delores's undisputed "share and share alike" attitude. We also note Delores's reliance on her children for many years for the operation of her farms—both the physical work and the business aspects of the operation. Testimony was presented that both Barbara and Michael had asked her to leave them farmland. And evidence was presented that Delores was becoming physically frail and starting to show signs of cognitive decline and confusion.

---

[5] Barbara challenged this factor at trial and in her motion for new trial. We address that challenge below.

Although we think this is a close case, we are constrained by our standard of review—correction of legal error and viewing the evidence in the light most favorable to the nonmoving party. Under that standard, Mark's testimony provided sufficient evidence to submit the question of undue influence to the jury. According to Mark, since Ralph's death in 1995, Delores relied on him for many of the financial and business operations of the farm operation; while they discussed the decisions, Delores's direction was always, "whatever you think." And after she sold Charles the land his home was on for a low price in 2002, Mark let her know he did not think it was a good idea, and they both signed a note that said "I will talk to Mark before I do anything stupid again," which he said was "a joke" between them. Several years later, when she was working on her will and mentioned "needing a figure" for the value of her land, and knowing her brother had just sold land for nearly $8000 an acre, Mark expressly told her to make it low and assured her the rest would "make it right." The jury could reasonably infer Mark's advice, which Delores had relied on for many years, resulted in Delores's use of low, outdated land prices when determining an equal distribution instead of more current values (that may have been ten times the 1995 value).

While Barbara correctly argues that Delores had the right to value her property at a low price and she could have intended the resulting inequality, Lisa and Debra had the right to present evidence the value used was the product of undue influence rather than Delores's intention. Considering the evidence Lisa and Debra presented in the light most favorable to them, the court did not commit a legal error by submitting the question of undue influence to the jury. The court did not err in denying Barbara's motion notwithstanding the verdict.

**B.    New Trial Issues**

Barbara also raises a number of issues related to the motion for new trial, which we address sequentially.

**1.  Admission of the 1995 Will**

Barbara asserts the district court erred when it admitted Delores's 1995 will into evidence and that it "materially affect[ed] her substantial rights."  Barbara urges the court should only have admitted the 1995 will "if and when there was substantial evidence of undue influence . . . rising to the level of moral coercion." The will was offered into evidence by the claimants during Lisa's testimony. Barbara immediately objected, arguing the prior will was "irrelevant" and in pursuit of a "false narrative of let[ting] the jury decide between the June 30, 2010, [w]ill[] and the June 30, 1995, [w]ill."  Charles's lawyer added that the will "would be misleading for the jury" and more prejudicial than probative.  Lisa and Debra's attorney countered that the will was evidence of Delores's past intent and therefore relevant to proving Delores's intent was not reflected in the 2010 will.

The court ruled "there is at least some relevance to the evidence as to [Delores's] intent."  It determined the weight given to the evidence considering the passage of time "would be the province of the jury."  And in the jury instructions, the court included this statement:

> You have also heard evidence that Delores Todd executed a Will in 1995.  By its terms and date, the 2010 Will revoked the 1995 Will. You are not determining whether the 1995 Will was valid.  You may consider the 1995 Will, along with all other evidence, only in determining whether Delores had the ability to make the 2010 Will and whether the 2010 Will was the result of undue influence.

We review claimed error in the admission of evidence for an abuse of discretion. *Kindig v. Newman*, 966 N.W.2d 310, 317 (Iowa Ct. App. 2021). We will only reverse if "the grounds for admission were clearly untenable or clearly unreasonable." *Id.* (cleaned up).

The 1995 will was offered not long after testimony of Delores's equal treatment of all family members when it came to presents for birthdays, Christmases, graduations, and weddings. Multiple witnesses, both before and after the will's admission, testified to Delores's commitment to "share and share alike, seven ways." Considering the burden was on Lisa and Debra to prove the 2010 will did not reflect her true intent and was instead the product of mental incapacity or undue influence, and noting the court's specific limiting instruction on how the will was to be used, we find the court did not abuse its discretion in admitting the 1995 will as evidence of Delores's historical intent.

### 2. Jury Instruction

When a new trial is requested based on alleged error in a jury instruction, we review for legal error and only reverse if prejudice results. *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 891–92 (Iowa 2015). "Jury instructions must convey the applicable law in such a way that the jury has a clear understanding of the issues it must decide." *Id.* at 892 (cleaned up). Prejudice occurs if the instruction misleads the jury or materially misstates the law. *Id.*

During the court conference reviewing jury instructions, Barbara objected to the inclusion of "confidential relationship" and its definition ("[W]hen one person has gained the complete confidence of another and purports to act or advise with only the interest of the other party in mind."). Barbara and Charles both argued

the evidence did not support a confidential relationship and it "does not relate in any logical way to the undue influence." Neither argued it was an incorrect statement of law. The court ruled the evidence supported not just parent–child relationships between Delores and her various children, but that the advice she sought on the farming operations could be found to create a confidential relationship in regard to the will.

We agree with the district court. After Ralph's death, Delores clearly relied on John and Charles to do the farm work and Mark to handle the business side of the farm. By 2010, Delores relied on her children's help, caregiving, and guidance for many aspects of her life and to allow her to remain in her home. We conclude there were sufficient indicia of a confidential relationship—which was only one of many factors listed—to be included in the undue influence instruction.

### C. Persons Exerting Undue Influence

Barbara last raises questions on how the court handled the identification of who, if anyone, exerted undue influence on Delores. The court's verdict form specified the jury did not have to unanimously agree as to which person led to the undue influence verdict, only that the finding of undue influence by a beneficiary was unanimous. The verdict form then asked whether the jury found unanimously each of Barbara, Charles, John, Michael, and Mark "unduly influenced Delores Todd in the making of the 2010 Will?" The jury marked "Yes" to Barbara, Michael, and Mark.

First, Barbara argues the court erred in instructing the jury it was not required to unanimously agree who exerted undue influence. She also claims the court erred in including each of the five non-contesting children on the verdict form

without substantial evidence how each exerted undue influence. Although she addressed these issues at trial, they were not raised in any of her posttrial motions, and each has error preservation issues.

While the first issue—whether the instruction the jury was not required to unanimously agree on who exerted undue influence was correct—is an interesting question, it is an academic one here as the jury here *did* find unanimously three of the children had exerted undue influence. Even if the instruction was legally incorrect—which we do not decide today—the error was harmless.

As to the inclusion of all five non-contesting children on the verdict form for the jury to consider whether they had exerted undue influence, we are not persuaded the court erred. As Lisa and Debra point out, Barbara did not object to the inclusion of all five names on the jury form's interrogatory. She "agree[d] with the Court's ruling" to include all five names, arguing it made "a cleaner record" and "provide[d] fairness and clarification for the record." Barbara cannot challenge on appeal what she agreed to below. *See Jasper v. State*, 477 N.W.2d 852, 856 (Iowa 1991) (noting one "cannot deliberately act so as to invite error and then object because the court has accepted the invitation"); *McCracken v. Edward D. Jones & Co.*, 445 N.W.2d 375, 378–79 (Iowa Ct. App. 1989).

Finally, Barbara asserts that a finding of undue influence by three of the beneficiaries should not invalidate the entire will. She did not raise this argument at trial or in her posttrial motions and did not request a jury instruction providing for partial invalidation in the event the jury found in favor of Lisa and Debra. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v.*

*Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).  We will not address this issue for the first time on appeal.

**AFFIRMED.**