# In the Iowa Supreme Court

No. 24–1053

Submitted September 09, 2025—Filed November 25, 2025

In the matter of the **Estate of Rex L. Felten,** deceased.

**Kathy Felten,**

Appellant,

vs.

**Karen Hoffman,** individually and as executor of the **Estate of Rex L. Felten,** Appellee.

Appeal from the Iowa District Court for Clinton County, Stuart P. Werling, judge.

A daughter disinherited by operation of a "no contest" clause in her father's will seeks reversal of an order overruling her objections to the final report of his estate. **Affirmed.**

Waterman, J., announced the judgment of the court and delivered an opinion, in which Oxley, J., joined. May, J., filed an opinion concurring in the judgment, in which McDonald, J., joined. McDermott, J., filed a dissenting opinion, in which Christensen, C.J., joined. Mansfield, J., took no part in the consideration or decision of the case.

Benjamin Arato (argued) of Wandro, Kanne & Lalor, P.C., Des Moines, for appellant.

Susan M. Hess (argued) and Sahil Kumar of Hammer Law Firm, PLC, Dubuque, for appellee.

**Waterman, Justice.**

"Happy families are all alike; every unhappy family is unhappy in its own way." Leo Tolstoy, *Anna Karenina* 3 (Leonard J. Kent & Nina Berberova eds., Constance Garnett trans., Mod. Libr. Paperback 2000) (1878). Familial strife poses challenges in estate planning. How can the patriarch of a conflict-ridden family draft his will to avoid additional conflict and costly litigation? One planning tool is an *in terrorem*[1] or "no contest" clause intended to discourage will contests by disinheriting any beneficiary who challenges the will. But what if there seem to be valid grounds to challenge the will? Iowa law has long provided a safe harbor for such challenges: if the challenge was filed in good faith and with probable cause, then the challengers take their inheritance even though their will contest was unsuccessful.

In this appeal, the eighty-nine-year-old patriarch executed a new will with a no-contest clause shortly before he died. The new will allegedly made significant changes from the prior will that divided the property evenly among the children. Under the new will, one daughter received the bulk of the estate, with much smaller gifts to the two remaining children. The disfavored children sued to set aside the new will, arguing that the favored daughter had secured the inheritance by unduly influencing their mentally infirm father. A jury rejected their challenge, and the district court enforced the no-contest clause. The losing daughter appeals, and both parties urge us to clarify the meaning of "good faith" and "probable cause" in this context, noting we have not revisited those issues since 1950. We retained the case to do so.

---

[1]From the Latin, meaning "[b]y way of threat." *In Terrorem*, Black's Law Dictionary 980 (12th ed. 2024).

We clarify our precedent by holding: (1) the challenger bears the burden of proving her good faith and probable cause under a totality-of-the-circumstances test, (2) good faith is a subjective standard, and (3) probable cause should be assessed using the definition contained in comment *c* to section 8.5 of the Restatement (Third) of Property, *see* 2 Restatement (Third) of Prop.: Wills & Other Donative Transfers § 8.5 cmt. *c*, at 195 (A.L.I. 2003) [hereinafter Restatement (Third) of Prop.] (requiring the challenger to prove "there was evidence that would lead a reasonable person, properly informed and advised, to conclude that there was a substantial likelihood that the challenge would be successful").

On our de novo review of the record, with deference to the factual findings of the district court, we determine that the challenger failed to prove that she filed her will contest in good faith and with probable cause. We therefore affirm the district court ruling that enforced the no-contest clause.

**I. Background Facts and Proceedings.**

Rex Felten and his wife, Mildred, had two daughters (Karen and Kathy) and one son (Kenneth). The family lived on Rex's farm near Maquoketa, Iowa, where they raised chickens and dairy cattle and cultivated corn and hay. Mildred died in 2002, leaving Rex to live alone. After his wife's death, Rex struggled to care for himself.

In the mid-2000s, Rex underwent two knee surgeries, which increased the hardship of living alone. To aid her father's convalescence, Kathy moved into Rex's home. There, she assisted him with daily activities.

By 2013, Rex's health had so deteriorated that he required full-time assistance. Kathy sold her home and took a larger role in caring for her father, feeding and bathing him, managing his medications, running errands for him, and addressing his continence issues. Rex also entrusted Kathy with his

financial affairs, granting her power of attorney (POA) to permit her to access his bank accounts and credit cards.

Rex's health continued to decline. He grew paranoid and forgetful. He was diagnosed with mild dementia. Rex's mother and sister had dementia, and Kathy observed similar behavior in her father. Rex's vision began to fail, necessitating cataract surgeries in December of 2019 and January of 2020. After these surgeries, Rex required various eyedrops. At first, Kathy helped her father administer these drops, but soon Rex began to resist her aid. He told Kathy that Karen had insisted that Kathy not touch the drops.

In December of 2019, Karen moved into Rex's home. Karen and Kathy clashed. Soon, they were fighting with such vehemence and regularity that Kathy moved out of the house, leaving Karen as Rex's primary caretaker. In January of 2020, Rex granted Karen POA. That April, he revoked Kathy's POA.

Karen installed video cameras in Rex's house and limited Kathy's access to Rex. In April of 2021, Karen wrote Rex a letter stating:

- "[Kathy] also used to tell me she wished you had died instead of mom [be]cause mom would have traveled with her."
- "You always said there are 2 kinds of people you can't trust, a liar and a th[ie]f. [Kathy] is both."
- "I am a mandated reporter of abuse because of my job as a therapy assistant. What she did with your finances is called Financial Elder Abuse. If anyone in authority finds this out I could lose my job, pay big fines, & serve jail time for not reporting it."
- "Mom's last words to me were that she was sorry the 2 of you didn't help me as much as you did Kathy & Kenn[eth]."

- "[Kathy] has been telling me for years she can't cut your hair anymore because it hurts her shoulders too much, so what happens if you need more help getting in & out of bed? Would she be able to physically do it? Or would she send you to a nursing home?"

Kathy did not see this letter until after she filed her will contest.

Karen took a role in Rex's estate planning. Throughout his life, Rex periodically altered his will, providing an inheritance for or disinheriting his children as he saw fit and including no-contest clauses in his prior wills. Whenever he was contemplating a change to his estate plan, Rex would visit his attorney, Billy Coakley, in Maquoketa, usually with Kathy present, and would get advice about the state of his current will, the effect that his proposed changes would have on the prospective beneficiaries, and the tax consequences of any proposed modifications.

After Kathy moved out, Karen and Rex began discussing his estate. Rex would describe the changes he wanted to make, and Karen would record them. In the summer of 2021, Rex, in consultation with Coakley, decided to overhaul his will. The proposed will left most of his real property to Karen. Kathy was to inherit a burial plot and the proceeds from a trust, for which Karen would serve as trustee. To Kenneth, Rex merely left a yellow toolbox. The draft included a no-contest clause, which provided:

> If any Beneficiary of this my Last Will and Testament shall institute or cause to be instituted, directly or indirectly, any suit, action or proceeding to contest the validity of my Will, or the validity of any part thereof, or to resist its probate, or to seek the destruction or contest the validity of the Last Will and Testament, then such Beneficiary so acting shall forfeit all of his or her right, title and interest to that portion or interest in my estate which he or she would otherwise have received under the provisions of this Will, and my estate shall be administered and distributed as though such Beneficiary had predeceased me without a spouse or descendants surviving him or her; provided, however, that nothing in this

paragraph shall be construed to prevent a Beneficiary from seeking enforcement of his or her rights as a Beneficiary under the Will in a court of equity.

Coakley, anticipating a will contest, directed Rex to take a cognitive test and acquire a doctor's report documenting his competency.

On June 23, 2021, Dr. Kimberly Thompson, Rex's family doctor, administered a cognitive test. After Rex received a perfect score, Dr. Thompson issued a letter stating that "[Rex] has been evaluated and is mentally competent to make his own decisions at this time." Coakley placed that letter in his file. Kathy was unaware of Dr. Thompson's letter.

Satisfied with the results of the test, Coakley made a house call, and, on July 2, he witnessed Rex execute the new will. Nineteen days later, Rex passed away at age eighty-nine.

Karen, as executor of Rex's estate, admitted the will to probate. Kenneth and Kathy challenged the will, arguing that Rex lacked testamentary capacity, that Karen had exercised undue influence to convince Rex to disinherit Kenneth and Kathy, and that Karen had intentionally interfered with Kenneth and Kathy's inheritance. Karen counterclaimed for abuse of process, alleging that the will contest was brought in bad faith. The district court granted summary judgment dismissing Karen's counterclaim, ruling that genuine questions of fact surrounding the execution of the new will supported Kathy's challenge to the will. The court observed that precedent supported "protecting the right of ready access to the courts." (Quoting *Wilson v. Hayes*, 464 N.W.2d 250, 267 (Iowa 1990) (en banc).) The remainder of the case went to trial.

At the close of evidence, the district court denied Karen's motion for a directed verdict, ruling that "[t]here is sufficient evidence on each of the three counts for those counts to reach a jury question for the jury to determine."

Ultimately, the jury returned a verdict against Kathy and Kenneth on all three claims.

After the jury trial, Karen filed the final report in Rex's estate. Pursuant to Rex's will, specifically the no-contest clause, the final report purported to disinherit Kenneth and Kathy because of their failed will contest. Kathy objected to the final report, arguing that, because she acted in good faith and had probable cause to contest the will, the district court should permit her to inherit, despite the no-contest clause. Following a hearing, at which neither side offered any additional evidence, the district court overruled Kathy's objections and approved the final report, writing:

> Having heard the testimony of the parties at trial and reviewed the pleadings, this Court FINDS that Kathy's claim lacked good faith and probable cause to contest the Will. The evidence was overwhelming that Rex wished to enforce harmony among his heirs and to punish any heir who disobeyed his wishes through disinheritance. Therefore, the Final Report is Approved and the objection of Kathy is DENIED.

Kathy appealed, and we retained the case.[2]

**II. Standard of Review.**

Kathy does not appeal from the judgment on the jury verdict rejecting her will contest claims. Rather, she appeals from the district court ruling denying her objections to Karen's final report on Rex's estate. We review that ruling de novo.[3] *In re Est. of Roehlke*, 231 N.W.2d 26, 27 (Iowa 1975) ("A hearing on objections to a fiduciary's final report is an equitable proceeding. [Iowa Code] § 633.33. Our review is de novo." (citation omitted)). "In a de novo review, the appellate court examines the facts as well as the law and decides the issues

---

[2]Kenneth did not join Kathy's appeal.

[3]Kathy's brief argues that our standard of review is de novo. The opposing brief does not contest that assertion.

anew." *Brede v. Koop,* 706 N.W.2d 824, 826 (Iowa 2005). "Although we give deference to the trial court's findings of fact, we are not bound by them." *In re Est. of Roehlke,* 231 N.W.2d at 27.

**III. Analysis.**

Courts adjudicating no-contest or penalty clauses have recognized competing public policies. "Public policy reasons to support penalty clauses include preserving the transferor's donative intent, avoiding waste of the estate in litigation, and avoiding use of a will contest to coerce a more favorable settlement to a dissatisfied beneficiary." *Rodriguez v. Gavette* (*In re Est. of Shumway*), 9 P.3d 1062, 1065 (Ariz. 2000) (en banc). A countervailing public interest favors "allowing access to the courts to prevent probate of wills procured by or resulting from fraud, undue influence, lack of capacity, improper execution, forgery, or subsequent revocation by a later document." *Id.* "Penalty clauses work a forfeiture, which is disfavored in the law." *Id.* at 1067. The tension between these competing policies is reflected in the development of Iowa precedent.

Iowa courts have long enforced no-contest clauses. *See generally Moran v. Moran,* 123 N.W. 202 (Iowa 1909) (enforcing a no-contest clause), *overruled by, Cocklin v. Watkins* (*In re Cocklin's Est.*), 17 N.W.2d 129 (Iowa 1945). Originally, Iowa courts enforced the clauses mechanically, automatically disinheriting the challenger regardless of good faith. *See, e.g., id.* at 206. But the dissent in *Moran v. Moran* colorfully argued that a no-contest clause, like a "roaring lion," can impede the probate court's search for truth by frightening off would-be challengers who reasonably believe a will is invalid:

> Under the law no will can become effective in any of its provisions until it shall have been admitted to probate by the court. Before admitting it to probate, it is the duty of the court to investigate the facts and circumstances attending its execution and bearing upon

its validity, and to find judicially therefrom that such will was executed in due form, voluntarily, and understandingly by the purported testator. If the court should find otherwise, it must reject the will and refuse its probate. This duty is often, perhaps usually, performed in a formal and perfunctory manner. But the duty itself is more than formal. It is substantial and imperative and as sincere and solemn as any other judicial investigation and determination. Manifestly, in order to attain true judicial results, the court has need to learn true facts. These must come, if at all, from those who are or were in a position to know them. In obedience to the law a day of hearing is fixed, and notice thereof is published to the world. If the court is to learn the truth from outside sources of information, it is manifestly important that the highway of information to the court be kept open, and that there shall be no lion in the way. *But here is a forfeiture provision in the purported will itself which may be a roaring lion intended to terrorize every beneficiary of the will. Its demand is that no adverse evidence be volunteered. Its tendency is necessarily to suppress material facts, and thus to impede the administration of the law according to its true spirit.* A good faith contest of a will is in strict line and in strict consistency with the duty of judicial investigation and determination imposed on the court by the law.

*Id.* at 208–09 (Evans, C.J. dissenting) (emphasis added). Chief Justice Evans's reasoning set the stage to overrule *Moran* several decades later.

In *Cocklin v. Watkins* (*In re Cocklin's Estate*), we quoted Chief Justice Evans's dissent at length, surveyed precedent in other states, and overruled *Moran. Cocklin*, 17 N.W.2d at 132–35. We recognized a safe harbor for beneficiaries who challenged a will "in good faith and for probable cause." *Id.* at 135. We did not, in *Cocklin*, define either good faith or probable cause, but we found that both were present in the case, relying on three factors: (1) that the challengers acted upon the advice of counsel, (2) that the trial judge submitted questions of testamentary capacity and undue influence to the jury, and (3) that the jury deliberated for about thirty-five hours before reaching a verdict. *Id.* at 136.

We refined our approach five years later in *Geisinger v. Geisinger*, 41 N.W.2d 86 (Iowa 1950). In *Geisinger,* we affirmed the district court's fact-intensive determination that the contesting beneficiaries acted in good faith and with probable cause when they challenged a will that had a no-contest clause. *Id.* at 93. We looked to analogous probable cause determinations in civil malicious prosecution actions, and adopted the definition of probable cause used in section 675 of the Restatement (First) of Torts, which provided:

> One has probable cause for initiating civil proceedings against another if he reasonably believes in the existence of facts upon which his claim is based and reasonably believes that under such facts the claim may be valid at common law or under an existing statute, or so believes in reliance upon the advice of counsel received and acted upon as stated in the foregoing authorities.

*Geisinger*, 41 N.W.2d at 93 (quoting Restatement (First) of Torts § 675, at 446 (A.L.I. 1938)). But we did not further elaborate on the test that courts or practitioners should apply when evaluating a challenge to a will with a no-contest clause. And our court has not revisited the good faith and probable cause requirement since *Geisinger* seventy-five years ago.

The most recent elaboration of this area of Iowa law came in an unpublished decision by our court of appeals, *Estate of Workman v. Workman*, No. 16–0908, 2017 WL 706342 (Iowa Ct. App. Feb. 22, 2017).[4] The parties' briefs in this appeal focus on this nonprecedential decision. In *Workman*, the court of appeals reviewed the district court's enforcement of a no-contest clause. *Id.* at *1. The panel's analysis surveyed cases and commentators nationally to distill factors for determining whether the challenger satisfied the good faith and

---

[4]That appellate decision is one of a series of cases involving the Workman legacy. See *Est. of Workman v. Workman*, 903 N.W.2d 170 (Iowa 2017); *Est. of Workman v. Workman*, No. 17–0599, 2018 WL 4360894 (Iowa Ct. App. Sept. 12, 2018) (per curiam); *Workman v. Iowa Dist. Ct.*, No. 17–1038, 2018 WL 3302361 (Iowa Ct. App. July 5, 2018).

probable cause requirement, including: (1) whether the challenger relied on the well-informed advice of legal counsel, (2) whether the challenger understood the testator's intentions, (3) whether the testator's conduct following execution of the will was consistent with the stated intentions, (4) whether the testator's mental capacity made the testator susceptible to suggestion, and (5) whether the district court submitted a jury question as to the will contest, and, if so, how long the jury deliberated before reaching a verdict. *Id.* at *2. The court of appeals emphasized the well-informed advice of counsel as a key factor and attempted to reconcile the two jury-based factors, stating,

> The final two factors—whether there is a jury question and the length of deliberation—could be read as requiring proof of the underlying claim. These factors seem at odds with the Restatement's prescription to examine the facts at the time the will contest action is filed. *See Wilson* [*v. Dallas*], 743 S.E.2d [746,] 760 [(S.C. 2013)] (stating "proof of a claim is not required"); Restatement (Third) of Property: Wills and Donative Transfers § 8.5 cmt. c. On closer examination, we believe these factors bear on whether a challenger's subjective belief that he or she is filing a will contest in good faith is objectively reasonable. For example, if a challenger introduces no evidence of undue influence, the challenger's belief in the viability of the action at the time it was filed could be deemed unreasonable. Conversely, if the challenger introduces overwhelming evidence of undue influence, the challenger's belief could be deemed reasonable. These factors comport with an objective good-faith standard. *See Wilson*, 743 S.E.2d at 760 ("The question is not whether there was in fact undue influence, but whether the parties could in good faith reasonably believe so. . . . [S]omething more than a subjective belief or a mere allegation is necessary. . . .").

*Workman*, 2017 WL 706342, at *3 (fourth alteration and omissions in original). Applying the factors to the case, the panel affirmed the district court's summary judgment order enforcing the no-contest clause and disinheriting the challenger. *Id.* at *4–6. The court noted that the challenger offered no evidence that he relied on the advice of counsel. *Id.* at *4. A dissenting judge concluded that the challenger established his good faith and probable cause to avoid forfeiture. *Id.*

at \*7–8 (Potterfield, J., dissenting). Although *Workman* and our precedent considered the length of jury deliberations in the will contest, we caution against giving weight to this variable, which could change based on the complexity of the case or simply because of a stubborn holdout.

The parties in this appeal urge us to clarify Iowa's good faith and probable cause standards. We retained this case to do so through a precedential opinion.

In considering how to clarify Iowa law, we take a fresh look at the state of the law in other jurisdictions since *Geisinger* was decided seventy-five years ago.

Across our nation today, there are three basic approaches to no-contest clauses: (1) rigorous enforcement, (2) void as a matter of policy, and (3) enforceable unless challenged for probable cause (with an additional good faith requirement in some jurisdictions, including Iowa).

The first position relies on the principle that, if the testator had the forethought to place a no-contest clause in the will, then the courts should honor that intent. *See, e.g.*, *Finkle-Rowlett Revocable Tr. Dated August 28, 2009 v. Stiens*, 558 S.W.3d 95, 99–100 (Mo. Ct. App. 2018) (emphasizing that "no-contest clauses are 'to be [strictly] enforced [according to their terms] upon violation without regard to any exception based upon the good faith and probable cause of the contestant'" (alterations in original) (quoting *Cox v. Fisher*, 322 S.W.2d 910, 913 (Mo. 1959))); *EGW v. First Fed. Savs. Bank of Sheridan*, 413 P.3d 106, 110 (Wyo. 2018). *See generally* Martin D. Begleiter, *Anti-Contest Clauses: When You Care Enough to Send the Final Threat*, 26 Ariz. St. L.J. 629, 679 (1994) [hereinafter Begleiter] (defending a rigorous enforcement view). Iowa, too, originally took the rigorous enforcement position. *See Moran*, 123 N.W. at 206.

The second position, operating on the theory that the testator cannot close the courthouse door to those seeking to vindicate their legal rights, annuls any testamentary clause purporting to disinherit contesting beneficiaries. The

Florida legislature has codified this view. *See* Fla. Stat. § 732.517 (2021) ("A provision in a will purporting to penalize any interested person for contesting the will or instituting other proceedings relating to the estate is unenforceable.")

Carving out a middle ground, states that have adopted the third position enforce no-contest clauses unless the challenge to the will is supported by probable cause. This view enjoys wide support. *See, e.g.*, *Salce v. Cardello*, 301 A.3d 1031, 1050–51 (Conn. 2023) (D'Auria, J., dissenting) (identifying twenty-two states following the Uniform Probate Code approach under which no-contest clauses are unenforceable when probable cause supports the will contest); *see also*, Cal. Prob. Code § 21311 (2021); Tex. Est. Code § 254.005 (2021); Unif. Prob. Code § 2-517 (amended 2019) ("A provision in a will purporting to penalize an interested person for contesting the will or instituting other proceedings relating to the estate is unenforceable if probable cause exists for instituting proceedings."); 2 Restatement (Third) of Prop. § 8.5, at 194 ("A provision in a donative document purporting to rescind a donative transfer to, or a fiduciary appointment of, any person who institutes a proceeding challenging the validity of all or part of the donative document is enforceable unless probable cause existed for instituting the proceeding."). The Restatement (Third) of Property considers the challenger's good faith as a factor. 2 Restatement (Third) of Prop. § 8.5 cmt. *c*, at 195 ("A factor that bears on the existence of probable cause is whether the beneficiary relied upon the advice of independent legal counsel sought in good faith after a full disclosure of the facts."). And some courts expressly require proof of the challenger's good faith in addition to probable cause. *See, e.g.*, *Rodriguez*, 9 P.3d at 1066. Iowa has long required proof of both good faith and probable cause. *Geisinger*, 41 N.W.2d at 93.

Against that backdrop, we revisit and clarify the good faith and probable cause requirements for avoiding enforcement of a no-contest clause under Iowa

law. The purpose of probate is to ascertain and execute the testator's true intent. No-contest clauses, by their very nature, are a roaring lion, prowling before the courthouse doors, warding away potential challengers. *See Moran*, 123 N.W. at 208 (Evans, C.J. dissenting). Sometimes, the threat is salutary; it may prevent obstreperous beneficiaries from wasting the estate's substance on frivolous litigation. But at other times, a beneficiary with a genuine claim, daunted by potential disinheritance, will forgo a challenge. Our approach keeps the lion on a leash—maintaining the menace of the no-contest clause, while simultaneously permitting good faith challengers with probable cause to litigate the validity of the will without disinheritance.

We now resolve a threshold issue. Our court's precedent is silent on who bears the burden of proof. The court of appeals appropriately placed the burden on the challenger. *Workman*, 2017 WL 706342, at *6 ("On our de novo review, we conclude Dennis failed to establish probable cause and good faith for the filing of his will contest action."). Other courts are divided. *Compare Key v. Tyler*, 246 Cal. Rptr. 3d 224, 233–34 (Ct. App. 2019) (applying California statutory provisions to hold a plaintiff seeking to enforce a no-contest clause has the burden to prove the challenger lacked probable cause to contest the term of a trust), *with Gunter v. Pogue*, 672 S.W.2d 840, 844 (Tex. Ct. App. 1984) (party seeking to defeat a no-contest clause has "the burden to show that their will contest was brought in good faith and upon probable cause"). The Restatement (Third) of Property takes the majority view that places the burden on the party challenging the will. *See* 2 Restatement (Third) of Prop. § 8.5 cmt. *b*, at 195 (enforcing the no-contest clause unless the challenger "can establish that there was probable cause for instituting the proceeding. When the contestant establishes that there was probable cause . . . it would be a contravention of

public policy to enforce the no-contest clause"). Counsel for Kathy acknowledged at oral argument that she had the burden of proof.

We agree with the Restatement (Third) of Property's placement of the burden on the challenger, because the challenger is best positioned to explain what information was relied on to contest the will. Placing the burden on the challenger imparts presumptive validity to the no-contest clause, gives the challenger an opportunity to contest a potentially invalid will, and keeps the burden of proof consistent with general principles of Iowa law. *See* Iowa R. App. P. 6.904(3)(*e*) ("Ordinarily, the burden of proof on an issue is upon the party who would suffer loss if the issue were not established."), *applied in In re A.S.*, 906 N.W.2d 467, 475–76 (Iowa 2018). We hold that the party seeking to avoid the no-contest clause (Kathy) bears the burden of proving by a preponderance of the evidence that the challenge to the will was brought in good faith and supported by probable cause. "The determination of good faith and probable cause should be inferred from the totality of the circumstances." *Parker v. Benoist,* 160 So. 3d 198, 206 (Miss. 2015) (applying section 8.5 comment *c* of the Restatement (Third) of Property); *see also In re Est. of Seymour*, 600 P.2d 274, 278 (N.M. 1979) ("The court should infer the existence or absence of good faith and probable cause from the totality of the circumstances.")

We address the tests for good faith and probable cause in turn.

**A. Good Faith.** As noted above, we have enforced no-contest clauses unless the challenge was brought in good faith and for probable cause. We have not defined good faith in this context, nor have we explained its relationship with probable cause.

Authorities are divided on whether and how courts should apply the good faith standard. Some use an objective good faith standard. *See generally Holt v. Holt,* 282 S.E.2d 784 (N.C. 1981) (employing an analysis that asks whether there

was a bona fide dispute over the will). Others consider the challenger's subjective beliefs. *See Rodriguez*, 9 P.3d at 1066 ("While we agree that good faith is not the sole test, we believe subjective belief in the basis of the challenge is part of the required belief in the substantial likelihood of success."); *Winningham v. Winningham*, 966 S.W.2d 48, 52 (Tenn. 1998) ("As soon as the attorney advised the defendant of his error, the petition was withdrawn. The plaintiff presented no evidence of bad faith. Filing the suit was not 'a mere vexatious act' but was based on honest conviction."). Yet others do not consider good faith at all. *See, e.g.*, *Donkin v. Donkin*, 314 P.3d 780, 792 (Cal. 2013) (recognizing that, under California law, probable cause determines the enforcement of a no-contest clause). Here, the parties agree that under Iowa law, the challenger must prove both good faith and probable cause to avoid a no-contest clause.

Under Iowa law, good faith may be viewed objectively or subjectively depending on the context. *Sieg Co. v. Kelly*, 568 N.W.2d 794, 804–05 (Iowa 1997) (surveying Iowa cases and statutes and observing that "[t]he term 'good faith' has various meanings; sometimes it is viewed objectively and at other times, subjectively"). For example, we apply a purely subjective standard for determining good faith under Iowa Code section 232.73 (2021), which provides immunity for reporting child abuse. *See Nelson v. Lindaman*, 867 N.W.2d 1, 8–10 (Iowa 2015). When a party must show both good faith *and* proof of the objective reasonableness of their conduct, a subjective standard for good faith should be used, otherwise, the term would be redundant. *Sieg Co.*, 568 N.W.2d at 805. Because both good faith and probable cause must be shown to avoid forfeiture under the no-contest clause, and because probable cause is an objective test, we hold that a purely subjective standard applies to determine the challenger's good faith. *See Rodriguez*, 9 P.3d at 1066–67 (requiring challenger to show subjective good faith and probable cause viewed objectively).

Determining a will contestant's good or bad faith is important because no-contest clauses are intended to promote familial harmony and to protect estate assets by avoiding emotionally and financially taxing litigation. Lawsuits born of acrimony and bad faith are, therefore, the main evil no-contest clauses seek to avoid. Evidence that will contestants honestly believed in their case and had no intent to bleed out estate funds or those of other potential beneficiaries cuts in favor of avoiding forfeiture.

We conclude that will contestants must prove their subjective good faith to avoid enforcement of a no-contest clause. The contestants must also prove their challenge was supported by probable cause. We address that requirement next.

**B. Probable Cause.** In *Geisinger*, we adopted the Restatement (First) of Torts definition of probable cause. 41 N.W.2d at 93. This approach has been criticized as placing undue emphasis on the advice of counsel. *See* Begleiter, 26 Ariz. St. L.J. at 679. A pertinacious beneficiary can often find an attorney to champion the beneficiary's cause, even if the challenge is a long shot. *See id.* The emphasis the Restatement (First) of Torts places on advice of counsel also puts pro se will contestants on the back foot. *But see Kubik v. Burk*, 540 N.W.2d 60, 63 (Iowa Ct. App. 1995) ("We do not utilize a deferential standard when persons choose to represent themselves. The law does not judge by two standards, one for lawyers and another for lay persons. Rather, all are expected to act with equal competence. If lay persons choose to proceed pro se, they do so at their own risk." (citations omitted)).

In our view, a better definition is found in the Restatement (Third) of Property, which defines probable cause in the specific context of will contests as follows:

> Probable cause exists when, at the time of instituting the proceeding, there was evidence that would lead a reasonable person, properly informed and advised, to conclude that there was a substantial likelihood that the challenge would be successful. A factor that bears on the existence of probable cause is whether the beneficiary relied upon the advice of independent legal counsel sought in good faith after a full disclosure of the facts. The mere fact that the person mounting the challenge was represented by counsel is not controlling, however, since the institution of a legal proceeding challenging a donative transfer normally involves representation by legal counsel.

2 Restatement (Third) of Prop. § 8.5 cmt. *c*, at 195. We hereby adopt this definition of probable cause for will contests. We decline to enumerate a list of specific factors to be checked off in every case; rather, courts should examine the totality of circumstances.[5]

**C. Did Kathy Meet Her Burden to Prove Her Good Faith and Probable Cause?** On our de novo review, we must determine whether Kathy proved that she acted in good faith and with probable cause when she challenged Rex's will. We find that she failed to meet her burden of proof.

Importantly, the experienced district court judge who presided over the jury trial and heard the live testimony of the witnesses, including Kathy, expressly found that Kathy "lacked good faith and probable cause to contest the Will." We are reviewing the testimony on a cold transcript, and we give deference to that factual finding by the district court. *In re Est. of Roehlke*, 231 N.W.2d at

---

[5]The dissenting opinion does not disagree with our foregoing clarification of Iowa law on the burden of proof, good faith, and probable cause, but rather disagrees with our application of law to the facts on this record. The opinion concurring in the judgment would affirm under a strict enforcement approach to no-contest clauses but agrees that Kathy should be disinherited under our clarified standards for good faith and probable cause. So, four justices affirm the district court. Under our de novo review, we need not remand to the district court for a new hearing on Kathy's objections to the final report, but rather we apply the clarified standard ourselves. *See Brede*, 706 N.W.2d at 826.

27.[6] It matters not that the court denied Karen's motion for directed verdict, because we encourage district courts to apply the "Uhlenhopp rule." *See State v. Keding*, 553 N.W.2d 305, 308 (Iowa 1996) (approving the Uhlenhopp rule, "which encourages the district court to deny a motion for directed verdict" and "submit the case to the jury to avoid another trial in case of error").

The evidence at the jury trial showed Rex's health challenges, including mild dementia, Karen's ill-will towards Kathy, Karen's position of influence over Rex, and his death within three weeks of changing his will. But the evidence also showed that Rex's personal attorney took steps to ensure Rex was competent when he made those changes, including having him evaluated by his family doctor, who determined he was mentally competent at the time he wrote his final will. Coakley also testified that Rex made frequent changes to his will over the years—a fact Kathy knew since she often took Rex to Coakley's office and had expressed her displeasure to Rex about the trust arrangement for her share. What is more, Coakley, in response to Kathy's objection to the final report on Rex's estate, noted that Rex had included a no-contest clause in prior versions of his will, a fact that undercuts her claim that Rex only inserted the no-contest clause in his final will at Karen's behest.

It was not Karen's burden to prove Kathy lacked good faith or probable cause to challenge Rex's will. Rather, it was Kathy's burden to prove that she acted in good faith and with probable cause. Yet, when given the chance to present evidence supporting her good faith, Kathy presented nothing beyond her attorney's professional statement that he would file the will contest again. Kathy offered no other evidence at the hearing on her objections to the final report.

---

[6]The district court's findings were conclusory. We encourage trial judges to explain in detail the evidence supporting their findings, especially those as to a party's credibility or state of mind.

That hearing was her "put up or shut up moment." *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 808 (Iowa 2019) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). This record lacks critical evidence to show Kathy's good faith and probable cause, such as:

- *Any* testimony or documentary evidence of the facts Kathy provided to her counsel or of the advice Kathy received from her counsel before filing her will contest, much less a legal opinion that there was a *substantial likelihood* her will contest would succeed, or of her reliance on that advice. In fact, neither Kathy nor her counsel testified about his advice to her.[7]

- Examples of Kathy's presuit investigation, which presumably would have revealed Dr. Thompson's cognitive testing and opinion that Rex had the mental capacity to execute his final will. Coakley, Rex's attorney, obtained that medical opinion to deter and defeat a will contest and no doubt would have disclosed the medical opinion of Rex's treating physician before a lawsuit if only Kathy had asked him.

- Rex's prior wills, which allegedly treated Kathy more favorably. None were introduced into evidence as exhibits at the jury trial or during the hearing on Kathy's objections to the final report. She testified that she did not have the prior wills, but she presumably could have obtained them from Coakley (by subpoena if necessary).

---

[7]Reliance on advice of counsel can waive the attorney–client privilege for communications on the subject matter of the advice and makes the attorney a witness. *See, e.g., Peterzalek v. Iowa Dist. Ct.*, 7 N.W.3d 37, 47–48 (Iowa 2024); *Squealer Feeds v. Pickering*, 530 N.W.2d 678, 684–85 (Iowa 1995) (en banc), *overruled on other grounds by, Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 690 N.W.2d 38 (Iowa 2004). Depending on the strength of the underlying facts supporting a will challenge, that may be the price unsuccessful will contestants must pay to avoid forfeiting their inheritance under a no-contest clause.

Kathy's counsel, arguing that Kathy had probable cause for her suit, relies on his proffered professional statement, made after the jury trial, that he would bring the will contest again based on the same evidence. We accept his statement at face value. But neither Kathy nor her counsel revealed what investigation they made, what underlying facts Kathy shared, or what legal advice she received before filing the will contest. They simply note that both Kathy and her attorney signed the petition that commenced her will contest, and then rely on the certification of good faith under Iowa Rule of Civil Procedure 1.413(1), which provides in relevant part,

> Counsel's signature to every motion, pleading, or other paper shall be deemed a certificate that: counsel has read the motion, pleading, or other paper; that to the best of counsel's knowledge, information, and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or cause an unnecessary delay or needless increase in the cost of litigation. . . . The signature of a party shall impose a similar obligation on such party.

Certification under rule 1.413, however, falls short of showing that Kathy's counsel advised her that there was a substantial likelihood her will contest would succeed based on an accurate understanding of the facts. That is the type of advice from counsel that helps establish probable cause in this context. *See* 2 Restatement (Third) of Prop. § 8.5 cmt. *c*, at 195; *see also Workman*, 2017 WL 706342, at *4 (affirming summary judgment enforcing no-contest clause when challenger offered no evidence that he relied on advice of counsel); *cf. Rodriguez*, 9 P.3d at 1067 (finding probable cause based on an "important factor" that the challenger, before filing suit, obtained advice of counsel supporting her challenge along with the treating physician's written opinion that the blind testator "was 'borderline competent' during the last week of his life, that he

showed 'marked deterioration,' was 'waxing and waning,' and that by June 30 (four days after the will was signed), he 'clearly was incompetent' ").

What the record shows, quite clearly, is that Rex was well aware of the acrimony between Kathy and Karen and, as the district court expressly found, Rex included the no-contest clause "to enforce harmony among his heirs and to punish any heir who disobeyed his wishes through disinheritance." We reach the same conclusion. The testator's intent is our polestar. Therefore, we enforce the no-contest clause to effectuate Rex's intent.

**IV. Disposition.**

For the foregoing reasons, we affirm the district court order overruling Kathy's objections to the final report.

**Affirmed.**

Oxley, J., joins this opinion. May, J., files an opinion concurring in the judgment, in which McDonald, J., joins. McDermott, J., files a dissenting opinion, in which Christensen, C.J., joins. Mansfield, J., takes no part.

**May, Justice (concurring in the judgment).**

I appreciate my colleagues' efforts on this case. The plurality is correct to affirm the district court's enforcement of the no-contest clause in Rex's will. I respectfully concur in the judgment. I write separately to mention two things.

### I. The Narrow Issues Before Us.

First, it is worth emphasizing that this case *does not* present the question of whether Iowa should retain or abandon the good-faith-and-probable-cause exception to our general rule of enforcing no-contest clauses. That exception has been part of our law since 1945, when our court decided *Cocklin v. Watkins* (*In re Cocklin's Estate*), 17 N.W.2d 129 (Iowa 1945). Neither party to this appeal has asked us to reconsider *Cocklin.* Indeed, both parties assume that *Cocklin* and its exception are valid. Their only disputes are about *the scope* of the exception: What is required for the exception to apply and, ultimately, does it apply here? The plurality opinion properly resolves those disputes under our existing law.

### II. Thoughts for the Future.

Second, if future parties in a future case were to ask us to abandon the exception, there would be good reasons to consider granting that request and going back to our pre-*Cocklin* rule, under which no-contest clauses were categorically enforceable. *See Moran v. Moran,* 123 N.W. 202, 206 (Iowa 1909), *overruled by, Cocklin,* 17 N.W.2d 129. Although the plurality and the dissent say that no-contest clauses are like a "lion" that must be "on a leash" (per the plurality) or maybe even caged (as the dissent implies) through *Cocklin*'s exception, I am not so sure. Indeed, if any lion metaphor is appropriate, maybe the best comparator is Aslan, the benevolent lion of Narnia. C.S. Lewis, *The Lion, the Witch and the Wardrobe* 78–80 (HarperCollins 1994) (1950). After all,

no-contest clauses protect important purposes—the most important of which is the testator's intention that anyone who chooses to contest the testator's will shall not receive benefits of that will. *See* Martin D. Begleiter, *Anti-contest Clauses: When You Care Enough to Send the Final Threat*, 26 Ariz. St. L.J. 629, 632–34 (1994) [hereinafter Begleiter]. So maybe there is no need for a leash or cage. Maybe those clauses should just be enforced as written and, ordinarily, without extra litigation about whether the will challenger had good faith, probable cause, etc. *See id.* at 634.

We all agree, after all, that when there is litigation about a will, the court's chief function is to carry out the intent of the testator as expressed in the will. *See, e.g., Roll v. Newhall*, 888 N.W.2d 422, 426 (Iowa 2016) (noting that the intent of the testator as expressed in the will's language "is the polestar and must prevail" (quoting *Lawrence J. Rodgers Tr. v. Rogers* (*In re Est. of Rogers*), 473 N.W.2d 36, 39 (Iowa 1991))). This approach fits with the usual economic freedom enjoyed by Iowans: just as we have broad control over the disposition of our property during our corporeal lives, enforcement of wills gives us control over how our property will be divided when our bodies fail.

This testamentary freedom includes the freedom to place conditions on the gifts that are given through wills. *In re Est. of Roberts*, 171 N.W.2d 269, 271 (Iowa 1969) ("[A] testator may provide under what conditions certain devises and gifts will pass and become effective" (quoting *In re Pottorff's Est.*, 250 N.W. 463, 465 (Iowa 1933))). And so, ordinarily, a beneficiary can receive a gift under a will "only under the conditions imposed by the testator" through the will's language. Begleiter, 26 Ariz. St. L.J. at 634.

No-contest clauses are one of these conditions. The will offers a gift, but it imposes a condition: the recipient must not bite the will that feeds them, so to speak, by challenging the will. *See No-Contest Clause, Black's Law Dictionary*

1254 (12th ed. 2024) ("[A] testamentary provision that threatens to dispossess any beneficiary who challenges the terms of the will."). It seems like that condition ought to be enforced as written, as with other conditions. *But see* Begleiter, 26 Ariz. St. L.J. at 650–55 (acknowledging some special cases in which nonenforcement may be appropriate).

To be clear, though, if there were a successful challenge to a will, any no-contest clause in the will would be declared invalid along with the will itself. *Id.* at 645–46. For instance, if the jury had agreed with Kathy that there had been a fatal defect in Rex's will—such as a lack of testamentary capacity—then the will would be considered invalid, and its no-contest clause would have no effect. *See id.*

But that is not what happened here. Instead, the jury rejected all of the challenges to Rex's will. And so, as things stand now, we must consider the will to be a *valid* statement of Rex's true intent. And if that is the case, then why shouldn't we give full effect to the will *as written,* including its no-contest clause? Why should the parties and the courts expend more time and energy to decide whether Kathy had good faith or probable cause to mount her unsuccessful challenge? I struggle to see a reason.

It is true, of course, that although "the testator has the legal right to make any distribution of his property he may elect," that right is limited to distributions that are not "contrary to law or public policy." *In re Pottorff's Est.*, 250 N.W. at 465. Yet, unlike in some states, Iowa's legislature has not chosen to prohibit or even limit the enforcement of no-contest clauses. Begleiter, 26 Ariz. St. L.J. at 640–41, 640 n. 75 (citing Ind. Code § 29-1-6-2 (1992); Fla. Stat. § 732.517 (1976)).

That leaves only the question of whether public policy is offended by giving effect to the testator's written choice as expressed in the no-contest clause. *In re Est. of Roberts*, 171 N.W.2d at 271. I am not convinced that it is.

Ordinarily, we leave public policy issues to the people's democratically elected lawmakers in the general assembly. *See, e.g., Brodie v. Foxhoven*, 21 N.W.3d 380, 390 (Iowa 2025) ("The legislature is the branch of government responsible for advancing public policy." (quoting *Koester v. Eyerly-Ball Cmty. Mental Health Servs.*, 14 N.W.3d 723, 731 (Iowa 2024))). Conversely, "the power of the courts to declare a contract or provision of a will in contravention of sound public policy is quite limited." *In re Est. of Barnes*, 128 N.W.2d 188, 192 (Iowa 1964), *amended*, 130 N.W.2d 227 (Iowa 1964). "It is akin to the power of the court to declare a statute unconstitutional and should be exercised only in cases free from doubt." *Id.*; *accord P.M. v. T.B.*, 907 N.W.2d 522, 537–38 (Iowa 2018) ("The power to invalidate a contract on public policy grounds must be used cautiously and exercised only in cases free from doubt." (quoting *Thomas v. Progressive Cas. Ins.*, 749 N.W.2d 678, 687 (Iowa 2008))).

I don't think it's "free from doubt" that automatic enforcement of no-contest clauses is contrary to public policy. Indeed, as I'll discuss more below, the most powerful public policy considerations *support* that enforcement. *See* Begleiter, 26 Ariz. St. L.J. at 632.

I understand my colleagues' concern that—like a lion—a no-contest clause might scare challengers away from the courthouse doors. *See id.* at 644. As already explained, though, a no-contest clause doesn't actually prohibit anyone from going to court. With or without the clause, any beneficiary is free to challenge the will, as Kathy did. *See id.* at 644–45.

Rather, the clause's effect is simply to alter the mix of possible costs and benefits of litigation. With or without a no-contest clause, a potential

will-challenger must consider "a number of negative factors" that go along with litigation, including "costs, attorney's fees and counterclaims." *Id.* at 645. And, as Professor Begleiter reminds us, the potential loss of "the beneficiary's bequest under the no-contest clause is simply another factor that the beneficiary must consider in determining whether to challenge the will. It is no more a burden than any other cost of a legal action." *Id.* Surely, it is no more a burden than fee-shifting provisions in ordinary contracts. Under those provisions, a party that loses a contract case is *not only* deprived of whatever relief the party sought in the case *but is also* saddled with paying the other side's attorney fees (not to mention that party's own attorney fees). If that's not the sort of lion that will scare people away from the courthouse, I don't know what is. And yet, when a fee-shifting provision is clear and unambiguous, Iowa law requires its enforcement. *See NevadaCare, Inc. v. Dep't of Hum. Servs.*, 783 N.W.2d 459, 471–72 (Iowa 2010). I'm not sure why no-contest clauses should be treated differently.

So it seems that no strong public policy interest is offended by automatic enforcement of no-contest clauses. Conversely, powerful public policy reasons *favor* automatic enforcement. The strongest, of course, is the importance of honoring the testator's intent. *See Roll*, 888 N.W.2d at 426. As Professor Begleiter has explained, though, there are at least three other interests worth considering.

First, although will contests are "rarely successful," they still tend to deplete the estate through litigation costs. Begleiter, 26 Ariz. St. L.J. at 635. This can easily involve tens of thousands of estate dollars. Those dollars will not go to the people whom the testator wanted to benefit. Instead, those dollars will go to the one thing that the testator expressly *did not want*: a contest over the will.

Moreover—and at the risk of great understatement—a will contest can "generate family animosity" among the contestants. *Id.* at 636. Many reasonable parents can understand the benefit of deterring such contests.

Finally, as this case demonstrates, a will contest deprives the testator and their family of privacy. *Id.* After all, if there is no will contest, the world might never learn about a family's inner turmoil or the testator's personal health issues. But if there is a will contest, those private matters will be examined in a very public way—all at a time when the testator is in no position to respond. *Id.* Those matters may even be the topic of lengthy appellate court opinions that are posted on the internet—as is happening in this case. Indeed, if you've read this far in my opinion, then you've probably also read the plurality's reporting about Rex's children and their vehement conflicts, including Karen's accusations that Kathy engaged in "Financial Elder Abuse." You've probably also read about the many indignities of Rex's decline. His struggle to care for himself. His need for his daughter to assist him with feeding and bathing. His continence issues. His paranoia. His dementia. And so on.

Yet these unfortunate disclosures might well have been avoided if the no-contest clause had succeeded in deterring this litigation. This again suggests that no-contest clauses should be enforced uniformly—and not just in cases where the plaintiff lacks good faith and probable cause. The lion needs to be as scary as it can.

**III. Conclusion.**

For now, *Cocklin*'s good-faith-and-probable-cause exception remains a part of Iowa law. This case provides no opportunity to reconsider it. But if that opportunity should arise, there would be good reasons to think again. I respectfully concur in the judgment.

McDonald, J., joins this concurrence in the judgment.

**McDermott, Justice (dissenting).**

The plurality recites Chief Justice Evans's description of no-contest clauses as a metaphorical "roaring lion" that impedes the court's search for truth by frightening off would-be challengers with valid claims. The plurality asserts that in counterbalance, the good faith and probable cause exception preventing enforcement of no-contest clauses "keeps the lion on a leash." But the court provides no comfort when, by minimizing weighty evidence of probable cause supporting the will contest in this case, the court fashions a leash so long that the roaring lion can patrol the courthouse steps with free rein. In my view, Kathy more than established that when she filed her petition to contest the July 2021 will, she acted in good faith and with probable cause. Because we have long refused to enforce no-contest clauses in these situations, and should do so here, I respectfully dissent.

The law favors carrying out a testator's intent concerning the disposition of their property as expressed in a will. *Am. Nat'l Red Cross v. White* (*In re J.O. McDonough Tr.*), 109 N.W.2d 29, 35 (Iowa 1961). Our cases treat no-contest clauses as valid exercises of a testator's wishes. *Geisinger v. Geisinger*, 41 N.W.2d 86, 93 (Iowa 1950). Among other beneficial purposes, no-contest clauses may avoid litigation among the will's beneficiaries that could dissipate the estate's assets, deter frivolous challenges by someone disappointed by the will's terms, or prevent a beneficiary from receiving (through settlement or otherwise) assets beyond what the testator wished. *See* 2 Restatement (Third) of Prop.: Wills & Other Donative Transfers § 8.5 cmt. *b,* at 194–95 (A.L.I. 2003) [hereinafter Restatement (Third) of Prop.].

Yet no-contest clauses are not sacrosanct. We have repeatedly recognized that in some cases, a will's terms should not be enforced because of an

impropriety in how the will was formed, such as when a testator lacks capacity to create a will or a testator falls victim to the undue influence of another. *See, e.g., Todd v. Todd (In re Est. of Todd)*, 585 N.W.2d 273, 276–78 (Iowa 1998) (affirming judgment setting aside a will based on undue influence); *First Sec. Bank & Tr. Co. v. Christianson* (*In re Est. Dankbar*), 430 N.W.2d 124, 131–32 (Iowa 1988) (same); *Helgeson v. Henderson* (*In re Est. of Herm*), 284 N.W.2d 191, 200–01 (Iowa 1979) (same); *Paschal v. Waudby* (*In re Est. of Ramsey*), 105 N.W.2d 657, 659–60 (Iowa 1960) (same). When this happens, it can't be said that enforcing the will carries out the testator's wishes; enforcing the will instead fulfills the wishes of an unscrupulous beneficiary who took advantage of the testator.

Our court's aim has thus been to find a middle ground between enforcing no-contest clauses and ensuring beneficiaries are not deterred from bringing meritorious will contests by the threat of disinheritance. We do so by refusing to enforce no-contest clauses when challengers show that they brought the claim in good faith and with probable cause. *See Geisinger*, 41 N.W.2d at 93. Good faith in this context refers to the plaintiff's subjective belief that the claim is being brought for a proper purpose. Probable cause, as the plurality recites, means that "at the time of instituting the proceeding, there was evidence that would lead a reasonable person, properly informed and advised, to conclude that there was a substantial likelihood that the challenge would be successful." 2 Restatement (Third) of Prop. § 8.5 cmt. *c*, at 195.

The no-contest clause is important in this case because Rex's will provided that Kathy would receive (1) a burial plot next to Rex at the cemetery, and (2) the entire net income of the "Felten Family Trust," including potential disbursements of trust principal at the trustee's discretion to meet Kathy's needs. If Kathy lost the will contest, the no-contest clause would be enforced, and Kathy would forfeit

"her right, title and interest to that portion or interest in [Rex's] estate"—a burial plot next to her father and income from the trust—that she otherwise would receive.

In determining whether good faith and probable cause exist, we look to a particular moment: "at the time of instituting the proceeding." *Id.* When Kathy filed the petition, she knew that her father struggled with memory problems, as she had lived with and cared for him from about 2006 until 2019 (when Karen moved in). Rex's mother and sister had dementia, and Kathy recognized the same behaviors in her father that she had observed in her grandmother and aunt after their diagnoses.

Considering that Rex began experiencing cognitive decline years earlier, it was reasonable for Kathy to doubt whether Rex had the capacity to create a new will. Add to this that Rex executed the challenged will on July 2 and died on July 21. Considering the state of Rex's overall health when he signed the will—dying a mere nineteen days later—suspicions about his cognitive state appear well-founded. Indeed, there can be little question that these doubts about Rex's capacity to execute the will were legitimate, as we know that even Rex's lawyer who prepared the will advised that Rex undergo cognitive testing with a physician before executing the will.

Kathy also knew that Karen's views often held sway with their father. As Kathy put it, "[I]f I ever had trouble getting him to go to the doctor, all I had to do was call her and he would jump up and go." Kathy recounted one occasion when she believed that Rex needed medical care, but Rex was resisting. Kathy sought Karen's help. Karen persuaded Rex to go to the hospital; once there, he was diagnosed with needing a pacemaker.

Kathy also had reason to believe that Karen was telling Rex negative things about her in the lead-up to the July 2021 will. Kathy's understanding turned out

to be true—and then some—with Kathy later learning that Karen had written a lengthy letter to Rex that accused Kathy of (among other things) having stolen cash and other items from Rex. Indeed, Karen asserted in the letter that Kathy's thefts were so egregious that they amounted to "Financial Elder Abuse." Karen claimed that as a mandatory reporter of abuse (because of her job as a therapy assistant), she "could lose [her] job, pay big fines," and even "serve jail time" for failing to report it. (At trial, Karen admitted that she had no evidence to support any theft claim.)

Kathy also knew about Rex's previous plans for the disposition of his assets in his will. Kathy, during the time she had taken care of Rex, had brought him to meet with his estate attorney several times to discuss his will. She thus knew that the terms of the July 2021 will diverged from his prior wills—and not coincidentally, nearly all in ways beneficial to Karen and detrimental to Kathy.

Taken together—the significant questions about Rex's cognitive state, the new will signed just nineteen days before Rex's death, Karen's confidential relationship with Rex and her ability to influence him, the animosity between Kathy and Karen, the changes to the will disfavoring Kathy and favoring Karen— the facts known to Kathy before filing her claim certainly satisfy the good faith and probable cause requirements. They constitute, in words adopted by the plurality today, "evidence that would lead a reasonable person, properly informed and advised, to conclude that there was a substantial likelihood that the challenge would be successful." *Id.*

Yet the plurality gives short shrift to these weighty facts and instead offers several critiques that, in my view, amount to little. The plurality begins by criticizing Kathy for failing to present evidence at the hearing on her objection to the final report. The plurality refers to the hearing as Kathy's "put up or shut up moment." But we have never before declared that a hearing on an objection to a

final report in probate spawns a "put up or shut up" evidentiary event. The plurality's language is pulled from prior statements in our cases about the evidence necessary to resist a motion for summary judgment. *See Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 808 (Iowa 2019). The full line states: "*Summary judgment* is not a dress rehearsal or practice run; 'it is the put up or shut up moment in a lawsuit, when a [nonmoving] party must show what evidence it has that would convince a trier of fact to accept its version of the events.' " *Id.* (alteration in original) (emphasis added) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). It's odd to invoke that language here considering that nothing requires courts to hold an evidentiary hearing on an objection to a final report. The hearing in this case was set at the executor's request and was held by videoconference. More importantly, the district court sat through the entire trial and was obviously familiar with all the evidence, thus making a replay of the same evidence at the hearing unnecessary. The district court, for its part, raised no concerns about any purported failure to present (or re-present) evidence at the hearing on the objection. On the contrary, it acknowledged and incorporated the evidence presented at trial, stating that its ruling was based on "[h]aving heard the testimony of the parties at trial and reviewed the pleadings."

The plurality also criticizes Kathy for failing to introduce as exhibits Rex's prior wills. The lawyers for both Karen and Kathy stated on the record that neither of them possessed any of Rex's prior wills. Regardless, it's unclear how introducing a prior will would have mattered. The testimony was uniform on the point that Kathy was treated less favorably under the July 2021 will than under prior versions. The district court certainly never signaled any dispute or confusion on this point.

The plurality also criticizes Kathy for failing to introduce evidence of her lawyer's advice about his opinion of the will contest's likelihood of success. But as the plurality acknowledges, advice-of-counsel evidence is of limited help in analyzing whether probable cause exists to bring a will contest. In an academic article that the plurality twice cites, the article's author concedes that "rarely is a beneficiary unable to find an attorney who will recommend litigation." Martin D. Begleiter, *Anti-Contest Clauses: When You Care Enough to Send the Final Threat*, 26 Ariz. St. L.J. 629, 679 (1994). Even if this evidence were consequential here, Kathy's lawyer in the objection filing stated directly that he "is prepared to make a professional statement as to the accuracy of the factual matters related to him that caused the case to be filed, and . . . that, while the case did not turn out as desired, he would not hesitate to take an identical case to a jury again." It seems apparent to me from this statement that (1) the lawyer believed that the facts known at the time he filed the case met the necessary threshold and (2) that he *still* believed the facts met that threshold at the end of the case.

Finally, the plurality criticizes Kathy for insufficiently investigating her claims before filing suit, and specifically faults her for not asking for the report about the cognitive testing that attorney Billy Coakley recommended that Rex undergo. But Kathy testified that Karen had shut her out of many matters involving Rex in the period leading up to his death. How was Kathy to guess that Rex's attorney would advise cognitive testing for Rex before signing the new will? It's certainly never suggested that anyone volunteered this information to Kathy. And even if Kathy had had the prescience to ask about it, and even if Kathy had received information about it, it's not clear to me that knowing about it would have much diminished the good faith or probable cause of Kathy's claims. The fact that Rex's attorney felt the need to advise such a step might reasonably have *heightened* Kathy's suspicions about Rex's cognitive state.

Today's decision throws out of whack the balance we have long attempted to create between the *enforcement* of no-contest clauses and the *endorsement* of will contests that root out wrongdoing. It will no doubt dissuade some—perhaps many—beneficiaries with valid claims in future cases from contesting wills and, in so doing, allow schemers to profit from their misconduct. Because Kathy filed her case in good faith and with probable cause, I would reverse the district court's order that overruled her objection to the final report and would hold the no-contest clause unenforceable as to her.

Christensen, C.J., joins this dissent.